404 F.2d 196
 UNITED STATES of America, Plaintiff-Appellee,
v.
A MOTION PICTURE FILM ENTITLED "I AM CURIOUS-YELLOW" ("Jar Ar Nyfigen-Gul") (35 mm., Black and White 6 Double Reels, 11,746 ft., Swedish soundtrack with English subtitles), Grove Press, Inc., Claimant-Appellant.
 No. 569.
 Docket 32448.
 United States Court of Appeals Second Circuit.
 Argued July 22, 1968.
 Decided November 26, 1968.
 
 Edward de Grazia, New York City (Richard T. Gallen, New York City, on the brief), for appellant.
 Lawrence W. Schilling, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York and David Paget, Asst. U. S. Atty., on the brief), for appellee.
 Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the district court, after a jury trial, ordering the forfeiture and confiscation under Section 305 of the Tariff Act of 1930, 19 U.S.C. § 1305 (1964)[1] of the motion picture entitled "I Am Curious-Yellow." We reverse the judgment on the ground that under standards established by the Supreme Court the showing of the picture cannot be inhibited.
 
 
 2
 "I Am Curious-Yellow" was produced in Sweden and the dialogue is in Swedish; English subtitles have been added. As with many other contemporary artistic productions there can be a difference of opinion as to what the picture is "about."[2] It would perhaps not be demonstrably wrong to say that it is concerned with that subject which has become such a commonplace in contemporary fiction and drama, the search for identity. It is the story of a young girl who is trying to work out her relationship to such political, social, and economic problems as the possibility of a classless society, the acceptance of the Franco regime, and the policy and practice of nonviolence. At one point the girl experiments with oriental religious ritual and meditation. The girl's inter-personal relationships are also pictured, including particularly her relation to her father, presented as an idealist who has become disillusioned and has given up meaningful activity. A fairly large portion of the film is devoted to the relations between the girl and her young lover.
 
 
 3
 A number of different techniques are employed in the production of the film. For example much of the early part is in terms of "cinema verité," showing the girl asking questions on subjects of public importance of the ordinary man or woman in the street. The problem of the nature of reality is suggested by passages representing the girl's fantasies and by the injection into the story of material concerning the making of the picture itself, such as the director's relations with the leading actress.
 
 
 4
 There are a number of scenes which show the young girl and her lover nude. Several scenes depict sexual intercourse under varying circumstances, some of them quite unusual. There are scenes of oral-genital activity.
 
 
 5
 It seems to be conceded that the sexual content of the film is presented with greater explicitness than has been seen in any other film produced for general viewing. The question for decision is whether, going farther in this direction than any previous production, the film exceeds the limits established by the courts.
 
 
 6
 The government argues with considerable cogency that the standards by which motion pictures are to be judged may be different from those that are used in the case of books. It points out that a motion picture reproduces actual conduct so that it can be seen and heard. Books are read by individuals in private, whereas motion pictures are viewed in public. Nudity and sexual activity in motion pictures, it is argued, bear a close resemblance to nudity and sexual activity in a public place. Obviously conduct of this type may be forbidden.
 
 
 7
 No doubt the standards by which motion pictures are to be judged differ in some particulars from those to be applied to books, see Freedman v. Maryland, 380 U.S. 51, 60-61, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 96 L.Ed. 1098 (1952); United States v. One Carton Positive Motion Picture Film Entitled "491," 367 F.2d 889, 907 (2d Cir.1966) (Lumbard, Ch. J., dissenting); but see Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). Nevertheless the comparison urged by the government between nudity and sexual activity in a public place and the same matters as portrayed in a motion picture such as "I Am Curious" is far fetched. In the motion picture the material is a part of an artistic whole and is united with and related to the story and the characters which are presented. This is vastly different from a sudden unrelated episode taking place in public. The exhibition in a motion picture of an isolated instance of sexual intercourse or of irrelevant nudity, which would indeed be equivalent to public display, could be halted under the established standards, just as could similar material if it appeared in print.
 
 
 8
 Whatever differences there may be in the application of obscenity standards, a motion picture, like a book, is clearly entitled to the protection of the first amendment. Joseph Burstyn, Inc. v. Wilson, supra; Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968). And the test of whether a motion picture is to be condemned is the three-fold test stated in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Atty. Gen. of Com. of Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966):
 
 
 9
 "[T]hree elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."
 
 
 10
 The issue of the obscenity of "I Am Curious" was submitted to the jury under this three-fold test and the jury found the picture obscene. However, in our view obscenity vel non is not an issue of fact with respect to which the jury's finding has its usual conclusive effect. It is rather an issue of constitutional law that must eventually be decided by the court. As Mr. Justice Harlan said in Roth v. United States, 354 U.S. 476, 497-98, 77 S.Ct. 1304, 1316, 1 L. Ed.2d 1498 (1957) (concurring and dissenting):
 
 
 11
 "[I]f `obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive and delicate kind. Many juries might find that Joyce's `Ulysses' or Boccaccio's `Decameron' was obscene, and yet the conviction of a defendant for selling either book would raise, for me, the gravest constitutional problems, for no such verdict could convince me, without more, that these books are `utterly without redeeming social importance.'" (Emphasis in original.)
 
 
 12
 See also the remarks of Mr. Justice Brennan in Jacobellis v. Ohio, supra, 378 U.S. at 187-90, 84 S.Ct. 1676.
 
 
 13
 Applying the Memoirs standards we find that the picture cannot be classified as obscene on at least two of the three grounds comprising the test.
 
 
 14
 Although sexual conduct is undeniably an important aspect of the picture and may be thought of as constituting one of its principal themes, it cannot be said that "the dominant theme of the material taken as a whole appeals to a prurient interest in sex." Whatever the dominant theme may be said to be (see footnote 2 supra) it is certainly not sex. Moreover, not only is the sexual theme subordinate, but it is handled in such a way as to make it at least extremely doubtful that interest in it should be characterized as "prurient."
 
 
 15
 It is even more clear that "I Am Curious" is not utterly without redeeming social value. Whatever weight we may attach to the opinions of the "experts" who testified to the picture's social importance, and whether or not we ourselves consider the ideas of the picture particularly interesting or the production artistically successful, it is quite certain that "I Am Curious" does present ideas and does strive to present these ideas artistically. It falls within the ambit of intellectual effort that the first amendment was designed to protect.
 
 
 16
 On the issue of whether the picture is "patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters," the jury's verdict may carry more weight. (But see Jacobellis v. Ohio, supra, 378 U.S. at 192-95, 84 S.Ct. at 1680; cf. United States v. Klaw, 350 F.2d 155 (2d Cir. 1965); see also Ginzburg v. United States, 383 U.S. 463, 479-80, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) (Black, J., dissenting)). However, it is unnecessary for us to pass upon this third test, since the picture is not obscene under the other two of the Supreme Court's standards.
 
 
 17
 We hold, therefore, that the picture cannot be condemned under Section 305.
 
 
 
 Notes:
 
 
 [1]
 § 1305. Immoral Articles; Prohibition of Importation
 (a) All persons are prohibited from importing into the United States from any foreign country any book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing containing any matter advocating or urging treason or insurrection against the United States, or forcible resistance to any law of the United States, or containing any threat to take the life of or inflict bodily harm upon any person in the United States, or any obscene book, pamphlet, paper, writing, advertisement, circular, print, picture, drawing, or other representation, figure, or image on or of paper or other material, or any cast, instrument, or other article which is obscene or immoral, or any drug or medicine or any article whatever for the prevention of conception or for causing unlawful abortion, or any lottery ticket, or any printed paper that may be used as a lottery ticket, or any advertisement of any lottery. No such articles whether imported separately or contained in packages with other goods entitled to entry, shall be admitted to entry; and all such articles and, unless it appears to the satisfaction of the collector that the obscene or other prohibited articles contained in the package were enclosed therein without the knowledge or consent of the importer, owner, agent, or consignee, the entire contents of the package in which such articles are contained, shall be subject to seizure and forfeiture as hereinafter provided: Provided, That the drugs hereinbefore mentioned, when imported in bulk and not put up for any of the purposes hereinbefore specified, are excepted from the operation of this subdivision: Provided further, That the Secretary of the Treasury may, in his discretion, admit the so-called classics or books of recognized and established literary or scientific merit, but may, in his discretion, admit such classics or books only when imported for noncommercial purposes.
 Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the collector to await the judgment of the district court as hereinafter provided; and no protest shall be taken to the United States Customs Court from the decision of the collector. Upon the seizure of such book or matter the collector shall transmit information thereof to the district attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.
 In any such proceeding any party in interest may upon demand have the facts at issue determined by a jury and any party may have an appeal or the right of review as in the case of ordinary actions or suits.
 
 
 [2]
 Thirteen "experts" (professional critics, English professors, a minister, sociology professors, a "professor of film," psychiatrists, a novelist) gave testimony as to their views of the social value of the film. Some of their answers to questions as to the dominant theme of the film were: change, transition; the nature of reality or of "modern" reality; the New Left; the interrelationship of various aspects of human activity; the quest for values; the beliefs and commitments of the young; the younger generation; the generation gap; the relationship between fantasy and reality; young people's search for identity and self-recognition; political, social and sexual maturity; political responsibility; the use of ritual to establish fundamental truth; the nature of politics; the complexity of modern reality
 
 
 FRIENDLY, Circuit Judge (concurring):
 
 18
 This court's responsibility here is limited. We are not, as Chief Judge Lumbard's dissent seems to assume, writing on what is largely a clean slate, but rather on one already well covered by our superiors. Our duty as an inferior federal court is to apply, as best we can, the standards the Supreme Court has decreed with regard to obscenity. That task, to be sure, is not altogether easy in light of the divergence of views within the Court and the consequent multiplicity of opinions; a scholarly article has deduced from the spate of decisions in 1966 no less than "five separate and contradictory tests." Magrath, The Obscenity Cases: Grapes of Roth, 1966 Sup. Court Rev. 7, 56-57.[1]
 
 
 19
 If the governing rule were still what Mr. Justice Brennan stated in Roth v. United States, 354 U.S. 476, 489, 77 S. Ct. 1304, 1 L.Ed.2d 1498 (1957), namely, "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest," I might well join Chief Judge Lumbard for affirmance. But, quite clearly, it is not. The modification began with the opinion of Mr. Justice Brennan, writing also for Mr. Justice Goldberg, in Jacobellis v. Ohio, 378 U.S. 184, 191-192, 84 S.Ct. 1676 (1964), and the transformation was completed in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975 (1966). There Mr. Justice Brennan, in an opinion joined by the Chief Justice and Mr. Justice Fortas, while professing adherence to Roth, emerged with a much more permissive standard. Under Memoirs a publication cannot be condemned simply because "the dominant theme of the material taken as a whole appeals to a prurient interest in sex" and "the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters." Although these criteria are met, "a book cannot be proscribed unless it is found to be utterly without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently: the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness." 383 U.S. at 418-420, 86 S.Ct. at 978. The deliberate character of this change was highlighted in the dissents of Mr. Justice Clark, 383 U.S. at 451, 86 S.Ct. 975, and Mr. Justice White, 383 U.S. at 460-462, 86 S.Ct. 975. Judge Hays' opinion sufficiently demonstrates the existence of the required modicum of social value here.
 
 
 20
 It is true that in Memoirs Mr. Justice Brennan wrote only for three Justices. But it is plain that three other members of that bench would have opted for an even more permissive standard and a fourth would have done so for federal action. Justices Black and Douglas have consistently considered all obscene matter to be "constitutionally protected, except where it can be shown to be so brigaded with illegal action that it constitutes a clear and present danger to significant social interests," Magrath, supra, 1966 Sup. Court Rev. at 56. Mr. Justice Stewart believes that the First Amendment permits the outlawing only of hard-core pornography, Jacobellis v. Ohio, supra, 378 U.S. at 197, 84 S.Ct. 1676 (concurring), and Ginzburg v. United States, 383 U.S. 463, 499-500, 86 S.Ct. 942 (1966) (dissenting). Mr. Justice Harlan initiated the hard-core pornography limitation with respect to federal action although he would allow greater leeway to the states, Roth v. United States, supra, 354 U.S. at 496, 77 S.Ct. 1304 (concurring and dissenting), and he continues to hold this view, Ginzburg v. United States, supra, 383 U.S. at 493, 86 S.Ct. 942 (dissenting).
 
 
 21
 While I do not challenge Chief Judge Lumbard's views about the offensive character of the extensive displays of nudity and sexual activity in "I Am Curious-Yellow,"[2] the latter falls short of Mr. Justice Clark's description of those which apparently comprise almost all of "Memoirs of a Woman of Pleasure," 383 U.S. at 445-446, 86 S.Ct. at 989. Not truly disputing that, the Government makes two arguments for a different result here. The first is that a stricter standard should apply to motion pictures and plays than to books. Although, for reasons indicated in the opinions of both of my brothers, there might be merit to this as an original question, I find nothing in the Supreme Court's opinions that would justify a lower court in embarking on such a doctrinal innovation, which might import further confusion into a subject already sufficiently confounded. Jacobellis related to a film and neither the majority nor the dissenting opinions suggested that any stricter standard would apply. The 5-to-4 per curiam affirmance in Landau v. Fording, 388 U.S. 456, 87 S. Ct. 2109, 18 L.Ed.2d 1317 (1967), affords too frail a foundation to support a construction of this sort.[3] The other is that there is no sufficient nexus in this film between the scenes of nudity and sexual activity and the problems of the girl — one could hardly call her the heroine — in trying to work out her relationship with life. Although Memoirs did not in terms require such a nexus, I would agree that the presence of "redeeming social value" should not save the day if the sexual episodes were simply lugged in and bore no relationship whatever to the theme; a truly pornographic film would not be rescued by inclusion of a few verses from the Psalms. While this case may come somewhat close to the line, I cannot conscientiously say that a connection between the serious purpose and the sexual episodes and displays of nudity is wholly wanting.
 
 
 22
 The only point requiring further discussion is Chief Judge Lumbard's elevation of the role of the jury. This has its attractiveness, if only in relieving busy appellate courts from having to spend so much time on cases like this. See O'Meara & Shaffer, Obscenity in the Supreme Court: A Note on Jacobellis v. Ohio, 40 Notre Dame Lawyer 1 (1964). But I find little support for his thesis in the many opinions of members of the Supreme Court during the last decade. Even Chief Justice Warren's more moderate statement in dissent in Jacobellis v. Ohio, supra, 378 U.S. at 202-203, 84 S.Ct. at 1686, that he would subject the judgments of lower courts "to a consideration only of whether there is sufficient evidence in the record upon which a finding of obscenity could be made," was concurred in solely by Mr. Justice Clark. Squarely to the contrary are Mr. Justice Harlan's observations in dissent in Roth v. United States, supra, 354 U.S. at 497-498, 77 S.Ct. 1304, and in speaking for himself and Mr. Justice Stewart in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), and Mr. Justice Brennan's expressions for himself and Mr. Justice Goldberg, joined in this respect by Mr. Justice Harlan, in Jacobellis v. Ohio, supra, 378 U.S. at 189-190, 203, 84 S.Ct. 1676. Placing the decisional task upon judges is a natural consequence of the emphasis on "a national standard of decency," Manual Enterprises v. Day, supra, 370 U.S. at 488, 82 S.Ct. 1432 (Harlan, J.), and Jacobellis v. Ohio, supra, 378 U.S. at 194-195, 84 S.Ct. 1676 (Brennan, J.), a principle peculiarly applicable to a federal statute governing the exclusion of a film from the entire United States.[4] Likewise the jury has no special competence on the issue of "redeeming social value." Finally, the Director of the Imports Compliance Division of the Bureau of Customs here conceded that the film had social value; the contrary verdict cannot be supported, for reasons outlined in Judge Hays' opinion; and the issue of a sufficient nexus is peculiarly unsusceptible for jury determination and never was submitted to it.
 
 
 23
 When all this has been said, I am no happier than Chief Judge Lumbard about allowing Grove Press to bring this film into the United States. But our individual happiness or unhappiness is unimportant, and that result is dictated by Supreme Court decisions. If we could depart from the plurality opinions in favor of the hard-core pornography test advocated by Mr. Justice Stewart and, for federal action, by Mr. Justice Harlan — which, we are told, would at least have the merit of manageability, see Magrath, supra, 1966 Sup. Court Rev. at 69-77 — reversal would be still more clearly dictated. What we ought to make plain, however, and not at all in a "tongue-in-cheek" fashion, is that our ruling is limited in two respects: The importer has represented that it intends to require exhibitors to exclude minors from the audience; it must realize that if this representation should be violated, the film and its distributors and exhibitors will be subject to attack under the principal of Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The importer, distributors and exhibitors should also realize that if they advertise the film in a manner calculated to capitalize on its extensive portrayals of nudity and sexual activity rather than its supposed serious message, Ginzburg v. United States, 383 U. S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), will be applicable.
 
 
 24
 With these reservations and with no little distaste, I concur for reversal.
 
 
 
 Notes:
 
 
 [1]
 The author notes that these three decisions, Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975 (1966); Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942 (1966); and Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966), gave rise to fourteen opinions, which spread over more than a hundred pages of the United States Reports. Id. at 7-8
 
 
 [2]
 Some but by no means all of the latter would fit Mr. Justice Goldberg's description of "fragmentary and fleeting." Jacobellis v. Ohio, supra, 378 U.S. at 197-198, 84 S.Ct. 1676
 
 
 [3]
 At the argument appellant's counsel pointed to a number of factors present inLandau but not here that could have provided the basis for that decision.
 
 
 [4]
 Mr. Justice Brennan's dissent in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 447, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957), quoted in the dissent here, antedated development of the "national standard" concept. While the jury is well adapted to reflect "the voice of the country-side," see 2 Pollock & Maitland, History of English Law 624 (2d ed. 1952), it would have even more difficulty than judges in determining what would be offensive nationally. See O'Meara & Shaffer, supra, at 8
 
 
 LUMBARD, Chief Judge (dissenting):
 
 25
 I dissent and vote to affirm the judgment of the district court which held that the film I Am Curious-Yellow should be barred from importation into the United States. That judgment was entered upon the verdict of a jury which, after seeing the motion picture and hearing the "experts" regarding its significance, unanimously found that its dominant theme appeals to a prurient interest in sex, that it is patently offensive because it affronts contemporary community standards, and that it is utterly without redeeming social value. All are agreed that Judge Murphy's charge correctly stated the law and instructed the jury. Indeed, counsel for the appellant took no exception whatever to the charge. I see no good reason why that jury verdict should be disturbed.
 
 
 26
 My colleagues give no satisfactory explanation why jurors are not as qualified as they to pass upon such questions. The conclusion is inescapable that they really think that the issue of obscenity can be entrusted to juries only if the judges themselves (or, as here, a majority of them) think the matters in question go beyond the limits allowed by law. I had not supposed that only those who wear federal judicial robes are qualified to decide whether a motion picture has any redeeming social value.
 
 
 27
 It is admitted that in its explicitness this picture goes beyond anything thus far exhibited in this country. As my brother Hays says, "It seems to be conceded that the sexual content of the film is presented with greater explicitness than has been seen in any other film produced for general viewing." The sexual aspect of the film does not arise from the plot, as that is non-existent; it arises from a decision by the director, Vilgot Sjornan, to produce a film which would shock the audience. He testified that in making the film he deliberately broke sexual taboos or cliches knowing that this would be shocking to the public.
 
 
 28
 The excerpts from the director's diary which were published in Sweden emphasize sex and the breaking away from old cliches about sex. The diary makes no mention whatever of any of the aspects of the film which it is claimed give it redeeming social value — the class structure in Sweden, ideas of non-violence, and the like.
 
 
 29
 Whatever one can say about the alleged significance of the film, which to this captive onlooker was a continuous and unrelieved boredom except for the sexual scenes, it is almost impossible to remember anything about it. The only impact the picture has and the only impact it was designed to have are the sexual scenes; its only interest to the viewer arises from the uncertainty of the method of mutual sexual gratification in which hero and heroine will next indulge.
 
 
 30
 While the sex is heterosexual, the participants indulge in acts of fellatio and cunnilingus. Needless to say these acts bear no conceivable relevance to any social value, except that of box-office appeal. Moreover, the sexual scenes have nothing whatever to do with the remainder of the picture. Obviously the only interest aroused for the average person is a prurient interest. Nor is it persuasive that the explicit sex scenes take only about 10 minutes out of 120. The enormous visual impact of a motion picture as distinguished from other media cannot be disregarded. Cf. Freedman v. Maryland, 380 U.S. 51, 61, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The combination of sight and sound, in the darkness of the movie theater, result in a uniquely forceful impact on the audience. Because of the nature of this medium, sexual scenes in a motion picture may transcend the bounds of constitutional protection long before a frank description of the same scenes in a book or magazine. Cf. Landau v. Fording, 245 Cal.App.2d 820, 54 Cal.Rptr. 177 (1966), aff'd per curiam, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967). Undoubtedly, the jury was aware of the difference between movies and other media when it found this film to be obscene.
 
 
 31
 But the majority would take away from the jury the power to pass on these not too difficult and complicated questions by saying that obscenity is "an issue of constitutional law" rather than an issue of fact with respect to which the jury's finding has its usual conclusive effect. To me this simply means that juries are not to be trusted where a majority of the judges disagree with them.
 
 
 32
 The action of the majority in nullifying the findings of the jury here goes beyond any case thus far decided in the obscenity area. No case is cited and I can find no case where the Supreme Court has set aside the verdict of a jury which has, under proper instructions, found present the three elements of obscenity as established by Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957) and Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L. Ed.2d 793 (1964). There is no reason to suspect that judges are in any better position to pass judgment on these matters than are jurors. Compare Mr. Justice Brennan's remarks in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 448, 77 S.Ct. 1325, 1331, 1 L.Ed.2d 1469 (dissenting opinion):
 
 
 33
 "The jury represents a cross-section of the community and has a special aptitude for reflecting the view of the average person. Jury trial of obscenity therefore provides a peculiarly competent application of the standard for judging obscenity which, by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards."[1]
 
 
 34
 With due deference to the very considerable intellectual attainments of my colleagues, I submit that when it comes to a question of what goes beyond the permissible in arousing prurient interest in sex, the verdict of a jury of twelve men and women is a far better and more accurate reflection of community standards and social value.[2] The jurors are drawn from all walks of life[3] and their less pretentious positions in the community qualify them to answer the questions put to them by Judge Murphy at least as well as circuit judges in their middle sixties who cerebrate in the ivory towers of the judiciary.[4]
 
 
 35
 It remains only to comment on Judge Friendly's tongue-in-cheek admonition to the exhibitors. They are cautioned that state authorities may still intervene if minors are admitted to see the picture or if the film is advertised to capitalize on nudity and sexual activity. All of which seems to me to amount to a concession that the entire public ought to be protected against the exploitation for profit of a film which a jury has out-lawed for obscenity in violation of the federal statute. However, as the contrary view of my brothers has prevailed here, I join Judge Friendly in pointing out that state and local authorities may intervene if minors are admitted to the audience or if those who promote the exhibition of the film do so in ways which capitalize on the film's "extensive portrayals of nudity and sexual activity."
 
 
 36
 I would affirm the judgment of the district court which barred this film from importation.
 
 
 
 Notes:
 
 
 [1]
 See also Chief Justice Warren, dissenting in Jacobellis, 378 U.S. at 199, 84 S.Ct. at 1686:
 "[P]rotection of society's right to maintain its moral fibre and the effective administration of justice require that this Court not establish itself as an ultimate censor, in each case reading the entire record, viewing the accused material, and making an independent de novo judgment on the question of obscenity. Therefore, once a finding of obscenity has been made below under a proper application of the Roth test, I would apply a `sufficient evidence' standard of review * * *."
 
 
 [2]
 It is no answer that so-called "experts" testified to social value of the film. Neither juries nor appellate courts are bound by expert testimony. Compare Landau v. Fording, 245 Cal.App.2d 280, 54 Cal. Rptr. 177 (1966), aff'd per curiam, 388 U.S. 456, 87 S.Ct. 2109, 18 L.Ed.2d 1317 (1967), where the film Un Chant D'Amour was held to be obscene notwithstanding testimony in support of the film by seven expert witnesses
 When "expert" witnesses testify, as one did here, that a film such as I Am Curious has religious and moral significance, it is understandable that the jury pays little attention to their testimony. Cf. Transcript at 148-51.
 
 
 [3]
 The records of the district court show that the jury in this case was made up of 7 men and 5 women who resided in New York City and its suburbs. They ranged in age from 32 to 68 years and engaged in widely varying occupations
 
 
 [4]
 Compare Mr. Justice Black, dissenting in Mishkin v. New York, 383 U.S. 502, 515, 516, 86 S.Ct. 958, 968, 16 L.Ed.2d 56 (1966):
 "But because of life tenure, as well as other reasons, the federal judiciary is the least appropriate branch of government to take over censorship responsibilities by deciding what pictures and writings people throughout the land can be permitted to see and read."