239 So.2d 613 (1970)
T.I. COLLINS, D/B/a University Cigar and News Stand, Petitioner,
v.
STATE BEVERAGE DEPARTMENT of Florida, and A.R. Brautigam, As Director of the State Beverage Department of Florida, Respondents.
No. L-416.
District Court of Appeal of Florida, First District.
September 8, 1970.
Rehearing Denied October 19, 1970.
John F. Roscow, III, of Scruggs, Carmichael & Tomlinson, Gainesville, for petitioner.
Jesse F. Warren, Jr., and W.R. Phillips Tallahassee, for respondents.
PER CURIAM.
The petitioner for a writ of certiorari seeks our review of an order entered by the State Beverage Department of Florida suspending his beer and wine license because of his sale and possession of obscene literature.
The principal question presented for our determination in these certiorari proceedings is whether the said department departed from the essential requirements of the law in entering the said order without any substantial, competent evidence before it that the said literature was in fact obscene.
The department filed two charges against the petitioner's beverage license  that on the date in question he possessed and sold to a department agent an obscene magazine *614 entitled "Foxy-Lady" for the price of $5.00, in violation of Sections 847.011(1) and 561.29(1) (a), Florida Statutes, F.S.A., and that on the said date he was in possession of certain obscene materials in violation of Sections 847.011 and 561.29(1) (a), Florida Statutes, F.S.A.
Subsequently, a hearing was held on the above charges before an examiner of the department. At that hearing, no competent, substantial evidence was presented to the effect that to the average person, applying contemporary community standards, the dominant theme of the material appeals to the prurient interest, nor that the materials lacked redeeming social values. Following the hearing the examiner filed his findings of fact and recommendation, to which the petitioner filed exceptions, and later the department entered the order which is the subject of these certiorari proceedings, finding the petitioner guilty of the said charges and suspending his beverage license for 15 days or, in lieu of the suspension, fining him $500.
Because of the vital rights under the United States Constitution involved in obscenity cases, particularly the First and Fourteenth Amendments thereto, the decisions of the U.S. Supreme Court defining obscenity have been generally accepted by the state courts of this country.
In the landmark decision of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the United States Supreme Court declared that the test of obscenity is "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In the later case of A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), the Supreme Court added to the test the qualification that, to be held obscene, "the material is utterly without redeeming social value."
The members of this court, as individuals, have examined the three magazines attached to the hearing examiner's findings of fact and recommendation, entitled "Foxy-Lady," "Peek," and "Miss Lesbo," presumably being some of the magazines taken from the petitioner's place of business, and, in our personal and judicial opinions, these magazines are patently offensive, highly obscene, and devoid of any social or artistic value whatever.
We realize, of course, that this opinion will have little value as a judicial precedent if we do not convey some idea of the content of the magazines which we hold to be per se obscene as a matter of law. These magazines are filled with unretouched photographs, in color and in black and white, of completely nude women, with cameras focused directly upon their genitalia. The positioning of their bodies in every instance appeals only to the prurient interest in sex, and are entirely devoid of any social or artistic value. As Mr. Justice Stewart said in his concurring opinion rendered in the case of Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793, we believe we know hard-core pornography when we see it. The written articles accompanying some of the pictures obscenely discuss abnormal sex practices, such as flagellation. The average person could not truthfully testify that these materials are not obscene under the Roth test, and no evidence is required to prove the obscene nature of the materials. They speak for themselves, for they are "autoptically obscene." For a more detailed and graphic description of the photographs and written material appearing in the magazines, see the appendix following the conclusion of this opinion which by reference is included in and made a part hereof.
The rule relied on by the appellant requiring competent, substantial evidence as the basis for a finding of obscenity was recognized by the U.S. Circuit Court of Appeals, Second Circuit, in United States v. Klaw, 350 F.2d 155 (1965), holding that the trial court should have granted a directed *615 verdict for the defendant in the trial of an obscenity case, when the government failed to present any evidence of the allegedly obscene material's prurient appeal. The government rested its case largely upon the exhibits themselves, insofar as proof of the obscene character of the materials was concerned. Like this court in the case at bar, the federal court in the Klaw case regarded the material in question as revolting and disgusting, saying:
"* * * this court regards the material as revolting and disgusting. But it is the record and not our feelings that must control. Here the jury had no opportunity to judge the exhibits presented to them by any standard other than their own speculation as to `prurient interest.' If they knew the standard set as a matter of law by other cases, their result might have been different. `Due process of law' would be a meaningless cliche if the nonsensical trash that is the subject to this prosecution were allowed to be the basis of a conviction by Judge or jury without any proof demonstrating that it has the proscribed effect on any of our citizenry. * * * Having in mind the alternatives of jail or freedom, courts must be aware of the facts of the `held-not-to-be-obscene' or `approved' cases, and ensure that the proof is sufficient to allow a fact finder to set this case apart from them. Otherwise it would be altogether too easy for any prosecutor to stand before a jury, display the exhibits involved, and merely ask in summation: `Would you want your son or daughter to see or read this stuff?' A conviction in every instance would be virtually assured."
On the other hand, in several recent decisions the federal courts have indicated that evidence of obscenity is not necessary under the Roth rule if the materials in question constitute "hard-core pornography." For instance, in United States v. Wild, 422 F.2d 34 (1969), the U.S. Circuit Court of Appeals for the Second Circuit distinguished its earlier decision in the Klaw case, supra, and said:
"There is no conceivable claim that these color slides have redeeming social value, and none was made. With regard to the other two elements which the Supreme Court has specified must be present for a finding of obscenity  appeal to the prurient interest of the group likely to receive the allegedly obscene material and patent offensiveness under contemporary community standards  the appellants argue that the Government introduced no evidence other than presenting the slides themselves. More specifically, appellants contend that the slides were designed for a male homosexual audience and that the jury was unable to decide whether there was an appeal to the prurient interest of that group without expert testimony.
"We do not believe, as appellants in effect urge, that the Constitution requires the Government to produce expert testimony about appeal to the prurient interest and contemporary community standards in every obscenity case. Compare Frankfurter, J., concurring in Smith v. California, 361 U.S. 147, 164-167, 80 S.Ct. 215, 4 L.Ed.2d 205, with Harlan, J., concurring in part and dissenting in part, Id., at 170-171, 80 S.Ct. 215. It is clear that such testimony can be necessary on certain facts such as those presented in United States v. Klaw, 350 F.2d 155 (2nd Cir.1965), heavily relied on by appellants. However, the present case presents no such peculiar problems of proof.
"We hold that in cases such as this the trier of fact needs no expert advice. As noted above, there was no claim of redeeming social importance. Cf. United States v. A Motion Picture [Film] Entitled `I am Curious  Yellow,' 404 F.2d 196 (2d Cir.1968). One group of slides graphically depicts a sexual act and the *616 other group focuses attention on the erect genitalia of the nude male models. In this context, the issues of prurient appeal and offensiveness to contemporary community standards can be dealt with by a jury without expert help. As the Supreme Court has stated, `in the cases in which this Court has decided obscenity questions since Roth, it has regarded the materials as sufficient in themselves for the determination of the question.' Ginzburg v. United States, 383 U.S. 463, 465, 86 S.Ct. 942, 944, 16 L.Ed.2d 31 (1966). Simply stated, hard core pornography such as this can and does speak for itself."
Again, in Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204 (1961), the Circuit Court of Appeals for the District of Columbia reviewed a conviction for mailing information as to how obscene materials could be obtained and for mailing such obscene matter. The Circuit Court of Appeals held that certain photographs, which the defendant assertedly had stated were intended for purchase by homosexuals, were "conclusive autoptical proof of obscenity and filth." and further said:
"Although the dispositive question in Roth v. United States was the constitutionality of anti-obscenity statutes, the Court there laid down some guide lines in other phases of the problem. Obscenity and filth have always lacked protection in our jurisprudence. The test given by the Court, and followed here by us, is `whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' And prurient interest, in the Court's definition, quoted from the Model Penal Code of the American Law Institute, includes `morbid interest in nudity, * * * [which] goes substantially beyond customary limits of candor'. The impact upon the average person is the criterion. The Court quoted with approval the instruction of the trial judge that the jurors judge the material by present-day standards of the community.
"Most of the difficulty which enshrouds discussion of the law concerning obscenity and filth develops upon consideration of books and magazine articles. Here arise problems of scienter, the meaning and effect of the whole, the value of the work to proper interests of the public, the contemporary community standards in similar matters, and other baffling problems under our precious right of free speech, discussed in the several opinions in Smith v. California. But we have no such problem in the case at bar. These are stark, unretouched photographs  no text, no possible avoidance of scienter, no suggested proper purpose, no conceivable community standard which would permit the indiscriminate dissemination of this material, no alleviating artistic overtones. These exhibits reflect a morbid interest in the nude, beyond any customary limit of candor. They are `utterly without redeeming social importance.'"
Similarly, we hold that the magazines before us are conclusive "autoptical proof" of obscenity and filth; that there are no conceivable community standards which would permit the indiscriminate dissemination of these materials; that there is no alleviating artistic overtones; and that they are utterly without redeeming social importance. In other words, we hold that these magazines are "hard-core pornography" and, as such, they speak for themselves. In our opinion, reasonable men could not differ as to their obscenity. There was no need, therefore, for the testimony of witnesses that the magazines are obscene under the standards recognized in the Roth case, supra.
Therefore, the order under review is approved, and the writ of certiorari is discharged.
*617 WIGGINTON and RAWLS, JJ., concur; CARROLL, DONALD K., Acting Chief Judge, concurs in part, dissents in part.
CARROLL, DONALD K., Acting Chief Judge, concurs in part and dissents in part.
I concur fully in the opinion but do not think that the appendix thereto is either necessary or proper.

APPENDIX
One of the exhibits contained in this record is entitled "Miss Lesbo, Special Edition, Exclusive Photos." The cover of Miss Lesbo displays a full color photograph of two nude girls sitting on a bed covered with imitation leopard skin. One girl is hugging the other  the second girl, covered only by the hair on her vagina, is caressing the other girl's leg with her left hand. The contents of the magazine profusely displays women either completely nude or partially clothed, with emphasis being focused upon their bare personal parts. Large photographs of girls caressing and hugging each other, with their tongues fluttering into open spaces, are common to the magazine. One photograph reflects a nude girl lying across the lap of a dominant nude girl who has a leather strap in her right hand raised in a position to beat the submissive one. Another photograph depicts two nude girls on a bed with the left breast of one almost touching the exposed vagina of the one in the lower position. Another photograph reflects two almost nude girls lying on their backs with legs outstretched, the left hand of one nude girl caressing the vagina of the other. One double-page photograph displays two nude girls engaging in various sequences of caressing play with each other, with the final scene depicting one girl on top of the other on the leopard-skin covered bed. Another full-page photograph shows one completely nude girl with her vagina and pubic hair prominently displayed  her hands and feet securely tied  her companion, a nude young girl, is posed kneeling above her with tongue protruding  apparently, the photograph was snapped just before the consummation of an attack upon her willing victim. Another photograph reflects two nude girls lounging upon a bed with the attention of both focused upon the vagina and pubic hair of one, while the second girl's finger is probing the outer parts of her companion's vagina.
The magazine does not discriminate. A full-page photograph reflects two bare girls of African descent  one is standing in an upright position and the second girl in a lower position is hugging the first and kissing her navel. A double-page full color photograph shows one girl in the lower position with her legs outstretched displaying her vagina and pubic hair  the girl in the upper position is in the process of chewing upon the other's right breast. The two girls are further displayed in a full color photograph with one standing next to a bed while the second girl is lounging across the bed with her arm around the other's waist with her mouth partially opened and her tongue caressing the area immediately above the first girl's vagina, which at this time is not yet uncovered. Another photograph of the two girls of African descent portrays both in a kneeling position facing each other and with one of them grasping in her right hand a long object which gives the appearance of a banana.
Page after page could be written in an attempt to describe the torrid photographs displayed in this one exhibit. It is not within this writer's literary ability to graphically describe the depictions presented. Apparently, as a redeeming social value, an article entitled "Wild Weekend" appears in this magazine. It begins with the plot of how three girls have enticed a fourth to go to a remote mountain cabin for a weekend, with anticipation of the dominant three chastising the fourth for stealing their several boy friends. The story, interspersed with photographs, discloses how two rings of plastic with an 18-inch length of chain were placed around the ankles of the victim, *618 and afterwards of how the victim was struck with a hairbrush until "her body had gone limp, its only movement the endless quiver of flaming red buttocks and a spasmodic jump in them at each stroke of the brush. The cries and sobs had stopped too. There was only the sound of harsh, uneven breathing and the sodden smacks of the brush. The three suddenly realized also, that they themselves were contributing most of the ragged breathing." After turning some nine pages of photographs of nude girls cavorting with each other, the story continues  the following page uses about one-fifth of its space for the story, with the remainder being devoted to a photograph  the next page has been preempted with a full-page color photograph of the two girls of African descent. We next encounter two full pages of nude girls with bodies intertwined, tongues flashing, hands caressing each other's legs and buttocks, and mouths in provocative poses, until we finally reach the climax of our story where the author recites that one of the three girls and her victim are together in the living room of the cabin, and to quote the author: "They melted softly, then harshly, almost frantically * * * `Kathy, oh, my god, Kathy' * * * Madeline's warm, slick tongue, like a snake gone beserk, made Kathy's body tense as if an electric current had jolted it * * * her arms wrapped around the girl, her hands gripped wildly at bare smooth flesh, * * * her fingers clutched, her mouth opened wide and then closed almost vengefully over Madeline's lips. Her arms tightened, and she twisted the girl, throwing her down on her back, bending over her. Her tongue forced Madeline's back into the warm darkness of the girl's mouth, harrassing it, chasing it, torturing it. `Kathy * * *' It was a muffled sigh, and Kathy responded by bearing down harder, her breasts crushing Madeline's, her mouth grinding deeper between the girl's lips, her tongue inventing new turns and twists and plunges. `Kathy! My darling!' * * * hands began to tear at Kathy's clothing. Kathy's body twisted and turned automatically, easing the task of stripping her, while her lips continued their demand on Madeline's. Her hands clutched Madeline's improbable breasts and her fingers punished the girl's erect nipples. `Baby,' mutter hoarsely, `Baby * * *' and then they were rolling together, white bodies against black bearskin, nakedly together, heatedly together, lost in each other, mad with each other. Kathy's hands squeezing plump buttocks so lately inflamed by the hairbrush, Madeline's panting mouth murmuring encouragements, Kathy's avid mouth devouring delectable nipples crowning breasts that would have been the envy of any goddess of beauty and fertility * * *' Of course, the other two girls got together in this same fashion during this "Wild Weekend" amid the continuing photographs so gratuitously offered by Miss Lesbo.
The dominant theme of the exhibit "Peek", which we cannot help but observe is a misnomer, is photograph after photograph, uncolored and colored, of nude or very sparsely clad young girls, with legs outstretched, huge nude breasts displayed, and pubic hair and vaginas spotlighted. One full-page color photograph portrays a well-endowed nude girl pulling her bare vagina into a very open position in order to give the viewer a look at its environs. The back cover of this magazine displays a young girl clad in long black stockings with her bare buttocks occupying a large part of the upper portion of the photograph prominently displaying her vagina and pubic hair while she "peeks" from her bent-over position. The magazine entitled "Foxy-Lady" is composed of more of the same type of material as is found in "Peek."