Joseph F. Hawkins, J.
It should be noted at the outset that this case is a civil proceeding and not a criminal prosecution. Although the statute invoked by the plaintiff is contained in the Code of Criminal Procedure, the relief sought is to enjoin the further distribution of an allegedly obscene periodical; it is not sought either to jail or to fine the defendants.
The District Attorney of Dutchess County, pursuant to section 22-a of the Code of Criminal Procedure, brings this action to enjoin the defendants from distributing a certain publication to minors “under the age of 17 years” as obscene “within the meaning of § 22-a of the Code of Criminal Procedure and Article 235 of the Penal Law. ’ ’
It should be further noted, preliminarily, that the District Attorney conceded at the trial that the publication whose further distribution is sought to be restrained would not be obscene as to adults within the contemplation of article 235 of the Penal Law.
As part of the attendant history of this action in equity, Mr. Justice Supple, on March 1, 1971, denied the defendants’ motion for a jury trial; he also denied a motion by certain parents and children for leave to intervene, but granted such petitioners leave to file a brief amicus curiae ‘1 following the submission of the cause for decision.” The plaintiff and the defendants have waived the provision in subdivision 2 of section 22-a, which adjures a decision within two days after the trial. *61 Further, counsel for both parties were allowed two days to submit memoranda of law after the conclusion of the trial, and counsel for the persons who sought leave to intervene was granted one week for such purpose pursuant to Justice Supple’s decision.
The controversy at bar was engendered by the distribution on the premises of the Arlington Senior High School of the January, 1971 (Issue No. 3) of a newspaper entitled Common Sense. That particular publication is the only one involved at bar and is hereafter referred to as “Issue No. 3.” It is of tabloid size, containing some 32 pages. The testimony was that some 8,000 to 10,000 copies were printed, but no witness knew how many have actually been distributed. Apart from distribution at the Arlington Senior High School, copies were placed in several stores. All copies were provided gratuitiously.
In addition to the newspaper’s corporate publisher, the three individually named defendants are those who are listed in the publication’s masthead. The petitioner’s evidence, apart from the publication itself, was limited to the testimony of Mr. Donald J. Nelson, principal of the high school, who testified to receiving many communications from irate parents who had seen the publication and had vehemently protested its circulation.
The respondents produced several witnesses. Dr. Ronald B. Robbins, a psychologist, initially noted he had neglected to examine his dictionary for the definition of the word “prurient.” After it had been defined for him by quoting from the Penal Law, he testified that, in his opinion, the publication was not prurient; on the contrary, that it had redeeming social value, was intended to influence and change social attitudes and basically was of a sociological nature. Dr. Robbins conceded that a photograph in the publication not only depicted an act of homosexuality but that the verbal matter associated therewith did endorse such practice.
Dr. Linda N. Pommer, professor of art at Vassar College, testified that in her opinion the publication was highly ‘1 moralistic ” and had a “boy-scout like flavor.” On cross-examination, although disclaiming any expertise in law, she, nevertheless, gave her views on pornography and the First Amendment. She also argued at considerable length with the District Attorney in his cross-examination as to what were the community’s standards which the law deems applicable. What emerged from her testimony is the contention that any so-called minority view must be granted a lectern.
*62 Rev. Raymond Cunningham, Jr., an Episcopalian clergyman, testified that Issue No. 3 had been read and studied by his class in English in which the students range from 10 to 16 years of age; also, that the questioned publication had redeeming social value. The latter conclusion resulted, in his opinion, from the articles in the publication, inter alia, dealing with ecology. He did not, however, agree with the views contained in the two questioned items.
A professor of philosophy, Dr. Robert C. Stover, testified as to the origins of the newspaper. It was started by some 10 or more persons who had decided that the community needed a second newspaper and one which espoused a 11 minority viewpoint.” He, too, testified that the publication had redeeming social value, similarly basing such conclusion upon the articles dealing with ecology and poverty; also, the quotation from Sojourner Truth." This witness personally disagreed with the content of the article on homosexuality.
The last witness for the defendant, Mrs. Olga Smyth, who teaches at a private school, stated that the paper was used in her class of 14 to 16-year-old students. Upon her questioning them, she testified that the students’ discussions were limited to the articles dealing with ecology, women’s liberation, etc., but that no one had commented on the article dealing with homosexuality or the disputed cartoon.
The defendants urge that the reference to section 235.00 of the Penal Law contained in section 22-a of the Code of Criminal Procedure bars the court from considering and applying the definition contained in section 235.20 and, more particularly, that in subdivision 6 thereof, which defines the phrase “ harmful to minors ” to mean:
‘ ‘ that quality of any description or representation, ih whatever form,, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it “ (a) Predominantly appeals to the prurient, shameful or morbid interest of minors; and
“ (b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable' material for minors; and
“(g) Is utterly without redeeming social importance for minors.”
Whether or not Issue No. 3 is obscene is a determination to be made by the court. The Court of Appeals in People v. Fritch (13 N Y 2d 119, 124) stated: “ It involves not a simple *63 question of fact, but a mixed question of fact and constitutional law, calling upon the court to make an appraisal of a publication and its contents against the requirements embodied in both State and Federal Constitutions.”
As noted in People v. Kirkpatrick (64 Misc 2d 1055, 1072): “In arriving at such determination, the court must allocate the weight to be placed upon any expert testimony, considering the quality and cogency thereof, but assigning no importance to merely the number of such experts testifying for one or the other side. In the final analysis, the court must be the expert in assessing what is the dominant theme, prurient interest, community standards, any redeeming social value, and the like. (O. Rogge, The High Court of Obscenity, 41 U. Col. L. Rev. 1, 25 [Feb. 1969].) This decision is solely for the court, and. it may not permit the usurpation of that function by the ‘ expert ’ or by the jury. (Memoirs v. Massachusetts, 383 U. S. 413, 450, 462, supra ; United States v. A Motion Picture Film [I Am Curious-Yellow], 404 F. 2d 196, 204 [1968].) ”
The defendants are mistaken in contending that section 235.20 is inapplicable. As previously noted, the court is determining the sufficiency of a complaint in a civil action; the provisions and exactitude with which an information must be framed as a predicate for criminal prosecution do not here obtain, and the rule of strictissimi juris is inapplicable. The contrary here applies. The Court of Appeals in Brown v. Kingsley Books (1 N Y 2d 177, 182), which the United States Supreme Court subsequently affirmed sub nom., Kingsley Books v. Brown (354 U. S. 436), construing section 22-a, noted an injunction lies ‘ ‘ after a full trial of the issues, and only upon a finding that the challenged publication is of the same character as would subject the defendant to punishment under the pertinent provisions of the Penal Law. What the statute does is to provide an additional sanction against the dissemination of obscene matter.”
It, therefore, follows that the definition of obscenity contained in section 235.20 of the Penal Law, applicable to minors under 17 (§ 235.20, subd. 1), may be here invoked where the complaint specifically is directed only against the distribution of the alleged offending publication to such infants.
In considering and in sustaining the constitutionality of section 22-a of the Code of Criminal Procedure, the United States Supreme Court in Kingsley Books v. Brown (supra, pp. 440-441) reaffirmed the powers of the courts and the States to proscribe obscene publications: “In an unbroken series of *64 cases extending over a long stretch of this Court’s history, it has been accepted as a postulate that ‘ the primary requirements of decency may be enforced against obscene publications. ’ Id, [283 U. S.] at 716. And so our starting point is that New York can constitutionally convict appellants of keeping for sale the booklets incontestably found to be obscene. Alberts v. California, post p. 476, decided this day. The immediate problem then is whether New York can adopt as an auxiliary means of dealing with such obscene merchandising the procedure of § 22-a.”
Mr. Justice Frankfurter, writing the prevailing opinion, speaks of the statute as “ a brake on the temptation to exploit a filthy business”; and that New York could constitutionally do so for “ it is not for us to gainsay its selection of remedies.” (pp. 440-441).
A three-Judge court of the Criminal Court of the City of New York, very recently in People v. Buckley (65 Misc 2d 917), sitting as a trial court in a criminal prosecution, had to determine whether a cartoon may be obscene within the definitions of the Penal Law. It was there confronted with: ‘ ‘ phallic oriented cartoons and pictures of nudes of both sexes. Some depict heterosexual and homosexual acts.” (p. 918).
That court convicted two of three defendants. In defining redeeming social value, they held that it imported ‘ ‘ the social value of a publication as a whole must at least have a modicum of significance to release it from blame.” (p. 922).
More significantly, People v. Buckley (supra) added another criterion to the list of so-called “ close cases ”, i.e., “ where the material by publication solicits sexual activity between parties, more especially deviate sexual activity, in violation of the provisions of a penal statute ’ ’ (p. 920) which is of particular import in resolving the issue at bar.
We now consider the publication in dispute. The plaintiff’s witness, the school’s principal, testified that in his opinion, pages 9 and 11 were obscene, and particularly so to those of impressionable age. On the former page, there is a photograph depicting two nude males in a homosexual embrace; on page 11, appears a cartoon depicting a young child doing gymnastics on a man’s erect penis drawn to exaggerated scale. Whatever the import of the wording therein contained — the witnesses were unable or unwilling to give explanations — the cartoon leaves nothing to one’s imagination. It is well within the phrase “ phallic oriented ” used in People v. Buckley (supra).
*65 The State is, in essence, the total and broadest “ community ” and it may impose more onerous criteria in defining pornography respecting infants than those it makes applicable to adults. In Ginsberg v. New York (390 U. S. 629) the United States Supreme Court considered the constitutionality of section 235.20 of the Penal Law. It both posed and resolved the problem: “It is enough for the purposes of this case that we inquire whether it was constitutionally impermissible for New York, insofar as § 484-h does so, to accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see. We conclude that we cannot say that the statute invades the area of freedom of expression constitutionally secured to minors.” (pp. 636-637).
Respecting the status of pornography vis-a-vis an infant, citing Mishkin v. New York (383 U. S. 502, 509) Ginsberg, in sustaining section 484-h of the former Penal Law, now section 22-a of the Code of Criminal Procedure, states that it: “ simply adjusts the defense of obscenity ‘ to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . . ’ of such minors.” (p. 638).
In Ginsberg (supra) the United States Supreme Court made it abundantly clear that there are valid and recognizable distinctions governing the freedom in this area for minors as against adults: c ‘ That the State has power to make that adjustment seems clear, for we have recognized that even where there is an invasion of protected freedoms ‘ the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . . ’ Prince v. Massachusetts, 321 U. S. 158, 170.” (p. 638).
In an article entitled ‘ ‘ Freedom of the Press in College and High School ” (35 Albany L. Rev., 161, 174) Robert Trager, phrased it most succinctly: 1 ‘ additional restrictions on free speech and press applicable to student publications are in the areas of obscenity * * * (See, e.g., Roth v. United States, 354 U. S. 476 (1957) ; Memoirs v. Massachusetts, 383 U. S. 413 (1966) ; Ginzburg v. United States, 383 U. S. 463 (1966) ; Mishkin v. New York, 383 U. S. 502 (1966) ; Attorney General v. ‘ Tropic of Cancer ’, 345 Mass. 11, 184 N. E. 2d 328 (1962).”
We appreciate that this field is fraught with pitfalls, legal and semantic. There are, indeed, manifold difficulties in barring obscene and lascivious matter from being distributed within the confines of a public high school. In that connection, the United States Court of Appeals for the Second Circuit in Eisner *66 v. Stamford Bd. of Educ. (N. Y. L. J., March 30, 1971, front page) considered at great length what criteria and safeguards were required whereby the constitutional rights and legal obligations of both students and the school authorities can be squared with the problem of keeping objectionable matter out of the precincts of a school.
On balance, I find that the matter in Issue No. 3 which can be deemed to have redeeming social value does not suffice to overcome the definitions of ‘ ‘ indecent material to minors ’ ’ contained in section 235.20 of the Penal Law and thus it is subject to injunctive relief. As has been stated by Judge Friendly in his concurring opinion in United States v. A Motion Picture Film (I Am Curious — Yellow) (404 F. 2d 196, 201), it does not suffice to render pornographic licit by ‘ ‘ lugging in ” or interlarding such matter with items of political or social significance, for “ a truly pornographic film would not be rescued by inclusion of a few verses from the Psalms.”
The law has had an unending, profound concern that unconstitutional restraints not be imposed upon the young lest their education and quest for knowledge be stifled or stultified. However, there abides the solicitude of parents and the State that the young not be corrupted educationally and, particularly so, by presumably mature adults.
In an exceptionally well-considered article, Professor Irving Kristol, Henry Luce Professor of Urban Values, New York University (New York Times Magazine of March 28, 1971) entitled “ Pornography, Obscenity and The Case For Censorship ” discusses the problem. Portions of the article are well worth quoting at some length for we believe them especially apposite:
‘' What reason is there to think that anyone was ever corrupted by a book?
" This last question, oddly enough is asked by the very same people who seem convinced that advertisements in magazines or displays of violence on television do indeed have the power to corrupt. It is also asked incredibly enough and in all sincerity by people — e.g., university professors and school teachers — whose very lives provide all the answers one could want. After all, if you believe that no one was ever corrupted by a book, you have also to believe that no one was ever improved by a book (or a play or a movie). You have to believe, in other words, that all art is morally trivial and that, consequently, all education is morally irrelevant. No one, not even a university professor, really believes that.”
*67 The salient and overriding concern is posed by Professor Kristol: ‘' What is at stake is civilization and humanity, nothing less. The idea that ‘ everything is permitted ’, as Nietzsche put it, rests on the premise of nihilism and has nihilistic implications. I will not pretend that the case against nihilism and for civilization is an easy one to make. We are here confronting the most fundamental of philosophical questions, on the deepest levels. But that is precisely my point — that the matter of pornography and obscenity is not a trivial one, and that only superficial minds can take a bland and untroubled view of it,”
Children are to be protected by their parents and by the State from exposure to foul “ literature and no less so than from contaminated milk.
It would appear that those who sponsored the publication and those students who wrote the articles designedly intended to provoke the very reaction which here occurred. Simply stated, the school authorities and others appear deliberately to have been taunted into the very action here taken.
It is my finding and conclusion that the further distribution of Issue No. 3, as hereinafter limited, should be enjoined and that the power to do so is expressly conferred by section 22-a of the Code of Criminal Procedure (see Ginsberg, 390 U. S. 629, supra). It is further concluded that section 235.20 must be read in pari materia; hence the injunction is limited so as only to restrain further distribution to minors under the age of 17 years, and within the school building or upon the grounds of the Arlington Senior High School or any other public grade or high school.
The defendants urge that injunctive relief should, additionally, be denied since by virtue of subdivision 3 of section 22-a, this court is required to order the seizure and destruction of the questioned publication. If it does so, it is contended that it is then barring adults from access to Issue No. 3. Professor Stover testified that of the 8,000 to 10,000 copies published, he had no idea as to how many had actually been distributed. He estimated that “several thousand” copies remained undistributed but of whose whereabouts he had no knowledge. Under the circumstances, there is no need to invoke said subdivision and thereby compel the Sheriff to seize unavailable copies of Issue No. 3.
I further find that although the statute contains the word “shall”, a court of equity is not bound to construe such language as inexorably mandatory, and particularly so where the *68 defendants disclaim any knowledge as to their existence or location.
The issue before the court is not moot. As previously noted several thousand copies remain and none of the defendants indicated during the trial or in their posttrial submissions that there would be no further circulation among minors. Under such circumstances, enjoining possible future distribution, should the defendants be so minded, is not academic; in fact, it is an integral part of the relief which must necessarily be accorded to the plaintiff.