**PASSAIC DAILY NEWS, t/a the Herald News, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 83–1661.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 24, 1984.

Decided June 15, 1984.

Henry I. Hamburger, New York City, for petitioner.

Abby Propis Simms, Atty., N.L.R.B. of the Bar of the District of Columbia Court of Appeals, Washington, D.C., pro hac vice by special leave of Court, with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent.

W. Terry Maguire, Richard M. Schmidt, Jr., and N. Frank Wiggins, Washington, D.C., were on the brief for American Newspaper Publishers Ass'n, et al., amici curiae urging that the decision and order be vacated.

Before WALD and MIKVA, Circuit Judges, and VAN DUSEN,* Senior Circuit

Judge for the United States Court of Appeals for the Third Circuit.

Opinion for the Court filed by Senior Circuit Judge VAN DUSEN.

VAN DUSEN, Senior Circuit Judge:

Passaic Daily News, t/a The Herald News ("the Company"), has petitioned for review of an order of the National Labor Relations Board ("the Board").[1] The Board has filed a cross-application for enforcement of its order. We have jurisdiction pursuant to sections 10(e) and 10(f) of the National Labor Relations Act ("the Act"). 29 U.S.C. §§ 160(e), 160(f) (1976). For the reasons that follow, we will enforce part of the Board's order, deny enforcement of part of the order, and remand the case for further proceedings consistent with our decision.

I.

The Company, a New Jersey corporation, is engaged in the business of publishing, selling, and distributing a daily newspaper, The Herald News. The Company maintains its principal office and place of business in Passaic, New Jersey. In addition to its facility in Passaic, the Company maintains other offices in New Jersey, including a Morris County bureau in Morristown, New Jersey.

In July 1977, the Company hired Joseph Lasica as a reporter covering municipalities in Bergen County. After an intermediary assignment, the Company assigned Lasica to the Morris County bureau. On January 15, 1979, Lasica notified The Herald News that he had formed a union organizing committee with some other editorial employees; the group hoped to gain union representation for all editorial employees. From January 1979 until August 1980, Lasica distributed union literature and held organizational meetings with editorial employees in an attempt to convince them to vote for the International Printing and Graphic Communications Union, Local 8 ("Local 8" or "the

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The Board's decision and order are published at 266 N.L.R.B. No. 161 (1983).

Union"). One editorial employee, Mitchell Stoddard, had been hired by the Company in October 1967. Stoddard served as the Company's Morris County bureau chief from October 1967 until March 1978. As bureau chief, Stoddard had several responsibilities, including administrative ones.[2] In addition to his administrative duties, Stoddard reported on Morris County stories and wrote a controversial weekly column that addressed issues affecting northern New Jersey. In March 1978, at the request of Coit Hendley, then the executive director of the Company, Stoddard agreed to and did serve as night editor of The Herald News.

Fifteen months later, in June 1979, Stoddard returned to the Morris County bureau. At that time Stoddard and Lasica were the only employees in the Morris County bureau; Stoddard was named bureau chief and nominally retained this position at all times relevant to this litigation. Although Stoddard considered himself as running the Morris County bureau after June 1979, the record includes credible testimony that Stoddard no longer performed the responsibilities that he had performed prior to his appointment as night editor.

Two Union representation elections were held, the first in May 1979 and the second in January 1980. After sustaining objections to these two elections, the Board directed that a third election be held in August 1980. During this period, Lasica was the driving force in the Union's organizational drive. Apart from Lasica's efforts on behalf of Local 8 in the first two elections, both Stoddard and Lasica continued to perform their normal duties in the Morris County bureau until June 1980. Moreover, despite the fact that Stoddard and Lasica were the only employees assigned to Morris County, the record is devoid of references to Stoddard's involvement with the Union until June 1980.

Stoddard testified that he approached Lasica in June 1980, inquiring what he could do to help the Union's efforts. Shortly thereafter, Lasica attempted to enlist Stoddard as a member of the Union's organizing committee; Stoddard, however, hesitated. Stoddard further testified that when he departed for vacation a few weeks later he still had reservations about permitting his name to be used as a member of the Union's organizing committee and communicated his reservations to Lasica. Nevertheless, in the Union's correspondence of July 28, 1980, while he was still on vacation, Stoddard's name appeared as one of twelve members of the organizing committee.[3] From July 28, 1980, until the election, Local 8 distributed ten campaign pamphlets, all of which listed the members of the organizing committee. Stoddard's name was on each pamphlet. Upon his return from vacation on August 4, Stoddard initially disclaimed the Union's use of his name in its literature. He, however, never asked Lasica to withdraw his name nor did he object to the repeated use of his name in subsequent publications. Instead, Stoddard testified that, because he was committed to the Union, he assisted with the organizing drive (127a).

The Company's writers, photographers, and editors selected Local 8 as their collective bargaining representative in the third representation election held on August 14–15, 1980.[4] Two days after the election, Stoddard's regular weekly column did not appear. In an affidavit, Stoddard recites that Jim Hile, the Sunday editor, "told me that within a half an hour of the election Hendley had come into where he [Hile] was, was madder than hell, had pulled out my column, and said that I was not going to have any more columns" (360a). The

---

2. As an administrator, Stoddard assigned reporters to cover news stories, reassigned reporters to cover breaking news stories, approved vacation requests, certified office expenses, reviewed the performances of bureau employees, and hired and fired bureau employees.

3. The correspondence of July 28 was the first correspondence to list the names of anybody other than Lasica or Jim Schofield, the president of Local 8.

4. On March 2, 1981, Local 8 was certified as the collective bargaining representative for the Company's editorial employees.

affidavit also recites that when Stoddard questioned Hendley about the weekly column, Hendley replied that it was the Company's new policy not to have reporters on the street write columns (360a).[5]

## II.

In response to the Company's actions and charges initially filed by Lasica, the General Counsel filed a complaint. The complaint alleged, *inter alia*, that the Company's decision to cancel Stoddard's column constituted an unfair labor practice within the meaning of sections 8(a)(1) and 8(a)(3) of the Act, 29 U.S.C. § 158(a)(1), 158(a)(3), and that the Company changed the conditions of employment of Stoddard in violation of sections 8(a)(1) and 8(a)(3).[6] The ALJ agreed. He concluded that the Company, "by ceasing the publication of Stoddard's weekly column, committed an unfair labor practice, in that it discouraged membership in the Union, in violation of Section 8(a)(3) and (1) of the Act" (20a). Moreover, the ALJ found that Stoddard was demoted due to his union activities (20a). The Board agreed; it affirmed the ALJ's rulings, findings, and conclusions and adopted his order, with a minor modification. The Board's order required the Company to cease and desist from engaging in the violation found and from engaging in any related manner designed to interfere with the employees' exercise of their section 7, 29 U.S.C. § 157, rights. Affirmatively, the Board ordered the Company to restore Stoddard to his former position as weekly columnist and resume publication of Stoddard's weekly column, subject to the same lawful standards and requirements that the Company imposes or may impose on its employees; to expunge from its files any reference to the cancellation of Stoddard's column; to notify Stoddard in writing that the references have been expunged and that evidence of this unlawful action will not be used as a basis for future personnel actions; and to post an appropriate notice [7] (2a–7a).

The Company petitions for review of the Board's order on five grounds. The Company contends:

(1) that Stoddard was exempt from coverage under the Act because he was a supervisor within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11);

(2) that Stoddard was exempt from coverage under the Act because he was a managerial employee;

(3) that substantial evidence did not support the Board's finding that the Company decided not to print Stoddard's weekly column because of his participation in protected, concerted activities;

---

**5.** To support Stoddard's claim that the Company was still printing other reporters' columns, the General Counsel introduced into evidence columns written by other reporters that postdated August 21, 1980, the date of Stoddard's meeting with Hendley. Faced with this uncontroverted evidence, the ALJ found that Hendley's proffered explanation was a "lame and factually untrue excuse" (20a).

**6.** The relevant paragraphs of the complaint read as follows:

"10. On or about August 26, 1980, Respondent cancelled the column of its employee Mitchell Stoddard.

"11. On or about August 26, 1980, Respondent changed the conditions of employment of its employees Joseph Lasica and Mitchell Stoddard and imposed more onerous and rigorous terms and conditions of employment.

\*    \*    \*    \*    \*    \*

"15. By the acts described above in paragraphs 9 through 13, and by each of said acts,

Respondent did interfere with, restrain and coerce, and is now interfering with, restraining and coercing, its employees in the exercise of the rights guaranteed to them in Section 7 of the Act, and Respondent thereby did engage in, and is now engaging in, unfair labor practices within the meaning of Section 8(a)(1) of the Act.

"16. By the acts described above in paragraphs 9, 10, 11 and 13 and by each of said acts, Respondent did discriminate and is now discriminating in regard to the hire, tenure and other terms and conditions of employment of Joseph Lasica and Mitchell Stoddard, and others of its employees, thereby discouraging membership in Local 8 and Respondent thereby did engage in and is now engaging in unfair labor practices within the meaning of Section 8(a)(3) of the Act."

**7.** The Board modified the ALJ's decision by adding the expungement remedy.

(4) that the First Amendment to the United States Constitution precludes the Board from challenging the Company's decision not to print Stoddard's weekly columns or inquiring into the Company's motives for deciding not to print Stoddard's columns; and

(5) that the First Amendment precludes the Board from requiring the Company to resume printing Stoddard's columns subject to further and continued Board scrutiny.

Because we find that Stoddard was covered by the Act and that substantial evidence, based upon the record as a whole, supports the Board's finding that the Company discontinued Stoddard's weekly column because of his involvement in protected activities, we will enforce the Board's order, except that part of such order requiring the Company to resume publication of Stoddard's weekly column. We hold that the portion of the order requiring the Company to "resume publication of Stoddard's weekly column, subject to the same lawful standards and requirements" that the Company imposes, or may impose, on its employees, impermissibly attempts to compel the Company to publish what it prefers to withhold in violation of the First Amendment and decline to enforce this part of the order. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974); *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972).

### III.

■ Section 7 of the Act provides that "employees" of an "employer" subject to the Act have the right to form, join, or assist labor organizations. 29 U.S.C. § 157. Section 8 provides that it is an unfair labor practice to interfere with, restrain, or coerce the exercise of those rights, *id.* at § 158(a)(1), or to discriminate "in regard to ... any term or condition of employment to ... discourage membership in any labor organization ...." *Id.* at § 158(a)(3). Two conditions precedent must be satisfied before sections 7 and 8 are even implicated. First, the party allegedly violating the Act must be an "employer" as defined by section 2(2), 29 U.S.C. § 152(2); and second, the employer must interfere with or otherwise discriminate against an "employee" as defined in section 2(3), 29 U.S.C. § 152(3). The Company does not dispute the ALJ's finding that it is an "employer" subject to the Act. The Company does dispute, however, the ALJ's finding that Stoddard was an "employee" entitled to the Act's protection. The Company, instead, contends that Stoddard falls within one or both of the exclusions from the Act created for supervisors and managerial employees.[8] The ALJ and the Board disagreed; they determined that Stoddard was neither a supervisor nor a managerial employee.

### A.

■ Section 2(11) of the Act defines the term "supervisor" as

"... any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances,

---

**8.** The exclusion for supervisors is explicitly created by the Act. 29 U.S.C. § 152(3) ("The term 'employee' ... shall not include ... any individual employed as a supervisor ...."). The managerial exclusion is a creation of the Board that has "been approved by courts without exception." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 288–89, 94 S.Ct. 1757, 1769, 40 L.Ed.2d 134 (1974) (citing cases). In *Bell Aerospace,* the Court summarized the managerial employee exclusion. It stated:

"In sum, the Board's early decisions, the purpose and legislative history of the Taft-Hartley Act of 1937, the Board's subsequent and consistent construction of the [National Labor Relations] Act for more than two decades, and the decisions of the courts of appeals all point unmistakably to the conclusion that 'managerial employees' are not covered by the [National Labor Relations] Act."

*Id.* (footnote omitted). *See also Washington Post Co.,* 254 N.L.R.B. 168, 169 & n. 6 (1981); *Swift & Co.,* 115 N.L.R.B. 752, 753–54 (1956) ("clear intent of Congress to exclude from the coverage of the Act all individuals allied with management").

or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). "To be a supervisor the person must 'possess real power "in the interest of the employer." ' " *Amalgamated Clothing Workers of America v. N.L.R.B.*, 420 F.2d 1296, 1300 (D.C.Cir.1969). In determining whether supervisory status exists, "[w]hat is decisive is what employees do rather than what they are called ...." *International Union of E., R. & M.W., AFL–CIO v. NLRB*, 426 F.2d 1243, 1247 (D.C.Cir.), *cert. denied*, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970). Past supervisory status is not determinative. Instead, great weight is given to the individual's current status. Moreover, the "Board is far more able than this court to evaluate 'the infinite possible variations in responsibilities enumerated in' " section 2(11). *Food Store Emp. U. Local 347, A.M.C. & B.W. v. N.L.R.B.*, 422 F.2d 685, 690 (D.C.Cir.1969) (citations omitted). Because of its expertise, the Board "necessarily has a large measure of informed discretion," and this court will sustain the Board's determination that an individual is an "employee" and not a "supervisor" if it is supported by substantial evidence. *Amalgamated Clothing*, 420 F.2d at 1300. *See also Stop & Shop Companies, Inc., Etc. v. N.L.R.B.*, 548 F.2d 17, 18 (1st Cir. 1977) (Board finding that certain employees are not supervisors is question of fact for the Board). Because substantial evidence in the record as a whole supports the Board's finding that Stoddard was not a

supervisor as that term is defined in section 2(11) when he resumed the position of Morris County bureau chief in 1979,[9] we will affirm the Board's finding on this issue.

**B.**

In addition to its contention that Stoddard was a supervisor, the Company argued, alternatively, that Stoddard was a managerial employee and, therefore, was not entitled to the Act's protection. In *NLRB v. Yeshiva University*, 444 U.S. 672, 682, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980), the Court defined managerial employees as those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer' " (citing cases). "Managerial employees must exercise discretion within, or even independently of, established employer policy and must be aligned with management." *Id.* at 683, 100 S.Ct. at 862; *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 286–87, 94 S.Ct. 1757, 1767–68, 40 L.Ed.2d 134 (1977). "[A]n employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Yeshiva University*, 444 U.S. at 683, 100 S.Ct. at 862 (footnote omitted).

In determining the "managerial" status of employees, again the Board makes a factual determination. The Board acts within an area "most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole." *See Marine Engineers v. Interlake Co.*, 370 U.S. 173, 180, 82 S.Ct. 1237,

---

9. The Company presented evidence tending to show that Stoddard considered himself as being in charge of the Morris County bureau, was given the title "bureau chief," was salaried and did not receive overtime, and was appraised as a supervisor. On the other hand, the Board's evidence showed that after Stoddard's return, he devoted his time to covering the news and writing about it. Stoddard and Lasica testified that they both reported to Miriam Taub, the news editor in Passaic, or Richard Paduch, the managing editor, that Stoddard no longer had authority to hire or fire employees, evaluate employees, authorize vacation or overtime requests, or assign work. Stoddard testified, for example, that he no longer hired or fired employees, did not give other employees their work orders, did not evaluate others, and had no one report to him (121–24a). Lasica, in fact, was the only other employee assigned to that bureau and Stoddard testified that he did not assign work to Lasica, did not edit his work, and did not have the authority to order him to work (124a). Finally, the Company's contention that Stoddard was a supervisor at all times relevant is belied by Stoddard's unchallenged participation, as an employee, in all three representation elections.

1241, 8 L.Ed.2d 418 (1962). Like its determination that an individual is, or is not, a supervisor, the Board's factual determination that an individual is, or is not, a managerial employee "if supported by substantial evidence on the record considered as a whole shall be conclusive." *See Board v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944) ("Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law").[10]

■ Substantial evidence in the record as a whole supports the Board's finding that Stoddard was not a "managerial employee," as the Board and the courts have defined that status, when he resumed the position of Morris County bureau chief in June 1979.[11] Accordingly, we will affirm the Board's finding.

Because we have determined that Stoddard was an employee, the two conditions precedent to the applicability of sections 7 and 8 of the Act—that the party allegedly violating the Act be an "employer" under section 2(2) and the allegedly aggrieved party be an "employee" under section 2(3) —are satisfied. Stoddard, therefore, is entitled to engage in section 7 activities and the Company is prohibited from engaging in the unfair labor practices set forth in section 8. Consequently, we now must determine whether substantial evidence based upon the record as a whole supports the Board's finding that the Company engaged in unfair labor practices.

## IV.

■ As noted above, *see supra* part III, an employer commits an unfair labor practice when it interferes with an employee's section 7 rights or discriminates "in regard to ... any term or condition of employment to ... discourage membership in any labor organization." 29 U.S.C. §§ 158(a)(1), 158(a)(3). "Conduct which violates any of the more specific prohibitions of section 8 [including section 8(a)(3)] would also coerce or restrain employees in their section 7 rights and would thus violate section 8(a)(1) derivatively." R. Gorman, *Basic Text on Labor Law* 132 (1976). To establish a violation of section 8(a)(3), and thereby a violation of section 8(a)(1), the General Counsel must establish that the employer acted "to encourage or discourage membership in any labor organization," that the employer acted discriminatorily, and that the employer was motivated by an anti-union animus. Establishing these facts presupposes that the General Counsel establishes that the Company was aware of the employee's activities on behalf of a labor organization. Like other factual findings, the Board's findings with respect to knowledge, discrimination, and

10. *Westinghouse Broadcasting Co., Inc., KYW–TV v. N.L.R.B.,* 503 F.2d 1055 (2d Cir.1974); *Westinghouse Electric Corporation v. N.L.R.B.,* 424 F.2d 1151, 1158 (7th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970).

11. The Company argues that Stoddard initiated his column, exercised discretion as to the subject matter and opinions expressed therein, "propounded his own personal viewpoints," and that his viewpoints became those of the paper. According to the Company, Stoddard thereby effectively formulated, determined, and effectuated management policies with absolute discretion. The Company primarily relies on *Wichita Eagle & Beacon Publishing Co., Inc. v. N.L.R.B.,* 480 F.2d 52 (10th Cir.1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 758 (1974). In *Wichita Eagle,* the court determined that two employees who were directly "involved in the formulation of [the] editorial content of a news-

paper" were aligned with management. *Id.* at 56. The employees were quite active in formulating and drafting the newspaper's editorials; they proposed topics and emphasized their own viewpoints in editorials. Because "[w]hat appears in an editorial is the subjective viewpoint of management," *id.* at 54, the court distinguished between the reporting of news and "the creation and expression of subjective opinion on behalf of a newspaper." *Id.* at 50. The former was the function of employees protected by the Act and the latter the function of "managerial employees" who were not protected by the Act.

Stoddard was not a participant in formulating the newspaper's editorials. Instead, Stoddard is a columnist who sets forth his personal views on controversial topics under his own byline. The record reveals insufficient evidence to support the Company's contention that Stoddard's column ever represented or became the viewpoint of the newspaper.

motive, are conclusive and should not be disturbed unless "irrational or unsupported by substantial evidence." *Oil, Chemical And Atomic Wkrs. Int. U., Local 4–243 v. N.L.R.B.*, 362 F.2d 943, 946 (D.C.Cir.1966); *Universal Camera Corp. v. Labor Bd.*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). When discrimination is alleged, the Board may infer discrimination from both direct and circumstantial evidence. *NLRB v. Link-Belt Co.*, 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); *Food Store Emp. U., Loc. 347, Amal. Meat Cut., Etc. v. N.L.R.B.*, 418 F.2d 1177, 1181 (D.C. Cir.1969) (*quoting NLRB v. Lester Bros., Inc.*, 337 F.2d 706, 708 (4th Cir.1964)).

▮▮▮▮ The Board and the Supreme Court recently have adressed the proper allocation of the burden of persuasion in cases in which an employer allegedly takes adverse action against an employee for engaging in protected activities and the employer's motive is questioned. In *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the Board distinguished, for purposes of analysis, between "pretext" cases and "dual motive" cases. The Board stated:

> "In modern day labor relations, an employer will rarely, if ever, baldly assert that it has disciplined an employee because it detests unions or will not tolerate employees engaging in union or other protected activities. Instead, it will generally advance what it asserts to be a legitimate business reason for its action. Examination of the evidence may reveal, however, that the asserted justification is a sham in that the purported rule or circumstance advanced by the employer did not exist, or was not, in fact, relied upon. When this occurs, the reason ad-

vanced by the employer may be termed pretextual. Since no legitimate business justification for the discipline exists, there is, by strict definition, no dual motive.

> "The pure dual motive case presents a different situation. In such cases, the discipline decision involves two factors. The first is a legitimate business reason. The second reason, however, is not a legitimate business reason but is instead the employer's reaction to its employees' engaging in union or other protected activities. This latter motive, of course, runs afoul of Section 8(a)(3) of the Act. This existence of both a 'good' and a 'bad' reason for the employer's action requires further inquiry into the role played by each motive and has spawned substantial controversy in 8(a)(3) litigation."

*Wright Line*, 251 N.L.R.B. at 1083–84 (footnote omitted). The Board then focused on the "dual motive" cases. After analyzing the conflicting positions different circuit courts had adopted, the Board formulated a new rule based on the Supreme Court's decision in *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[12] Under the test formulated in *Wright Line*, the Board first determines whether the "employee's employment conditions were adversely affected by his or her engaging in union or other protected activities." *Id.* at 1083. If the employee's employment conditions were adversely affected, the Board addresses the motivation issue to determine "whether the employer's action was motivated by such employee activities." *Id.* The approach the Board adopted in *Wright Line*, therefore, requires the General Counsel to "make a *prima facie* showing sufficient to support the inference that [the employee's participation in] the pro-

---

**12.** In *Mt. Healthy*, Doyle, an untenured teacher, instituted suit against the Mt. Healthy School Board, alleging that the Board had wrongfully refused to renew his contract. The Board gave two reasons for its refusal; one reason involved conduct protected by the First and Fourteenth Amendments, and one involved unprotected conduct. The Court fashioned a two-part test to

be applied in dual motivation contexts. First, the employee must establish that the protected conduct was a substantial or motivating factor in the decision not to rehire the employee. Second, the burden shifts to the employer to demonstrate that it would have reached the same decision "even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576.

tected conduct was a 'motivating factor' in the employer's decision." *Id.* at 1089. Once the General Counsel establishes a *prima facie* showing, the burden shifts to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct. Although its specific concern in *Wright Line* was the "dual motive" cases, the Board's rule is applicable to pretext cases as well.[13] *Id.*

In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Court affirmed the Board's application of the rule formulated in *Wright Line.* In addressing the pretext cases, the Court stated: "Under these provisions [section 8(a)(1) and 8(a)(3)] it is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, *or if the reasons that he proffers are pretextual,* the employer commits an unfair labor practice." *Id.* at ——, 103 S.Ct. at 2472 (emphasis added).[14] *See also NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967) ("once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him"). Once the General Counsel establishes discriminatory conduct that adversely affected the employment relationship, *Great Dane, Transportation Management,* and *Wright Line* squarely place the burden on the employer to show that legitimate objectives motivated the adverse action; failure to establish legitimate

motives *requires* a finding on behalf of the employee unless a First Amendment exception is warranted.

The General Counsel sought to meet its burden by presenting evidence of the Company's response to the Union's election literature. The evidence suggests that Hendley, in anger, ordered Stoddard's column pulled immediately after the representation election; that Stoddard's column was pulled two days after the representation election; and that the Company failed to offer any credible explanation for its action. Instead of offering a credible explanation for its actions, the Company relied on a pretextual justification and contended that the First Amendment served as a shield that prevented the Board from challenging the decision and inquiring into its motives. The Company thus effectively concedes that it failed to establish that it would have taken the adverse action "even in the absence of protected activities."

The ALJ made several factual findings; the Board adopted the findings without modification (4a). The ALJ concluded that the Company must have been aware of Stoddard's activities on behalf of the Union; that Hendley, in anger, ordered Stoddard's column to be pulled and not printed again immediately after the results of the August election were announced; that the Company's decision not to publish Stoddard's column constituted a demotion and, therefore, the terms and conditions of Stoddard's employment were adversely affected as a reprisal for engaging in union activities; and that the Company's action was discriminatory. We hold that substantial evidence based on the record as a whole supports the ALJ's findings.

**13.** The Board noted that one incidental benefit of its adoption of the *Mt. Healthy* test "is that the perceived significance in distinguishing between pretext and dual motive cases will be obviated." *Id.* at 1089 n. 13. Apparently, the distinction would no longer be necessary because if the General Counsel met his burden, the burden would shift to the employer. If the employer then failed to offer any explanation or offered pretextual reasons, he would not meet his burden and the General Counsel would prevail.

**14.** In analyzing *Transportation Management,* the Supreme Court did not follow the Board's suggestion that it is unnecessary to distinguish between "pretext" and "dual motive" cases. *See supra* note 13. Instead, it immediately distinguished and dismissed the pretext cases as *per se* violations of sections 8(a)(1) and 8(a)(3). The same result occurs, however, under both methods of analysis.

First, we find that substantial evidence supports the ALJ's determination that the Company must have been aware of Stoddard's efforts on behalf of the Union. The direct evidence shows that during the two weeks prior to the August certification election both the Company and the Union sent out literature urging the employees to adopt their respective positions. The Union's literature included a list of the names of twelve members of the Union's organizing committee; Stoddard's name appeared on each of ten lists. The Company's literature frequently included direct responses to the substantive arguments raised by the Union. Consequently, the ALJ's conclusion that "some, if not all" of the Union's campaign pamphlets found their way into [the Company's] possession" and, therefore, the Company must have been fully aware of those employees aligned with the Union (19a), was warranted. In addition to the direct evidence, circumstantial evidence supports the ALJ's finding. The timing of the Company's decision, the proffered justification, Hendley's statement immediately after the election that "that's the end of Stoddard's column," and the evidence that Hendley was "madder than hell" when he ordered that Stoddard's column be pulled support the ALJ's finding and bolster his conclusion.[15]

Second, substantial evidence supports the ALJ's finding that the terms and conditions of Stoddard's employment were adversely affected because of his efforts on behalf of the Union.[16] Prior to the election, Stoddard reported on news stories and wrote a controversial column over which he had almost unlimited discretion. Subsequent to the election, his column was cancelled. Stoddard testified that he was a writer, that writing a column "was a condition of my original employment" (133a), that he wrote a column from 1967, the year in which he was hired, until 1976, and that he was unhappy with his position as night editor because he would be required to edit rather than write. In light of Stoddard's testimony, we agree with the ALJ that the elimination of Stoddard's column-writing duties may properly be viewed as a demotion.

Third, substantial evidence supports the ALJ's finding that the Company's conduct was discriminatory. Discrimination involves "treating like cases differently." *Marathon LeTourneau Co., Longview Div. v. N.L.R.B.*, 699 F.2d 248, 253 (5th Cir.1983) (citations omitted). Although Hendley told Stoddard that the Company

---

**15.** We disagree with the Company's contention that the Board may not rely on this statement. The ALJ found that the Company did not object to Stoddard's testimony at the time, nor did it object to his affidavit when the General Counsel introduced the affidavit into evidence (16a & nn. 24, 25). The Company does not dispute these findings. It is axiomatic that "a failure to object to an offer of evidence at the time the offer is made, assigning the grounds, is a waiver upon appeal of any ground of complaint against its admission." C. McCormick, *Handbook of the Law of Evidence* 113 (2d ed. 1972). If "the evidence is received without objection it becomes part of the evidence in the case, and is usable as proof to the extent of whatever rational persuasive power it may have." *Id.* at 125. *See* 29 U.S.C. § 160(b). *RJR Communications, Inc.*, 248 N.L.R.B. 920, 921 (1980), is not inconsistent. It is unclear from the facts whether counsel objected to the hearsay evidence relied on by the Board. Moreover, we agree with the ALJ that this was "relevant and material hearsay." Consistent with *RJR Communications*, the hearsay was "corroborated by something more than the slightest amount of other evidence." *Id.*

**16.** The Company contends that the General Counsel's complaint never raised, and the parties never litigated, the issue of whether the change in Stoddard's role constituted a demotion. Although we agree that the complaint does not allege specifically that Stoddard was demoted, it does allege that the employer changed the terms and conditions of employment. *See supra* note 9. The "terms and conditions" language of section 8(a)(3) usually applies to more traditional types of employer actions, including discharge, demotion, and transfer. Stoddard, in fact, retained the salary and benefits of his former position. Nevertheless, we find that the language of section 8(a)(3) is sufficiently broad to encompass other forms of disciplinary action including the adverse action alleged herein. *See Wichita Eagle & Beacon Publishing Co.*, 199 N.L.R.B. 360, 367 (1972), *enf. denied on other grounds*, 480 F.2d 52 (10th Cir. 1973), *cert. denied*, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 758 (1974).

instituted a policy not to have reporters on the street write columns, the General Counsel introduced into evidence columns written by other reporters that postdated the effective date of the new policy. Accordingly, substantial evidence supports the ALJ's finding that Stoddard was treated in a discriminatory fashion.

Fourth, substantial evidence supports the ALJ's finding that the Company was motivated, at least in part, by its anti-union animus. The timing of the decision, the purported justification, and Hendley's state of mind at the time of the decision support the ALJ's finding. The General Counsel, therefore, established a *prima facie* showing that Stoddard's column was discontinued as a result of the employer's anti-union animus. Accordingly, we will affirm the Board's holding that the Company engaged in unfair labor practices unless we find that the Company presented evidence sufficient "to demonstrate that the same action would have taken place even in the absence of [Stoddard's participation in] the protected conduct." [17] *Wright Line*, 251 N.L.R.B. at 1089.

### V.

■ Instead of presenting evidence to persuade the Board that it would have discontinued Stoddard's column even if he had not engaged in protected activities, the Company argued that the First Amendment of the Constitution precludes the Board from challenging the Company's de-

cision and from inquiring into the motives for its decision.[18] We disagree and hold that *Associated Press v. Labor Bd.*, 301 U.S. 103, 131–33, 57 S.Ct. 650, 655–56, 81 L.Ed. 953 (1937), is dispositive of this contention.

In *Associated Press*, the Associated Press argued that the First Amendment precluded application of the Act to an agency of the press. Associated Press contended that because the case involved the discharge of an editorial employee, ostensibly for failing to perform up to his capabilities, it "must have absolute and unrestricted freedom to employ and to discharge those who ... edit the news." *Id.* at 131, 57 S.Ct. at 655. The Court disagreed. According to the Court, "[t]he statute does not preclude a discharge on the ostensible grounds for the petitioner's action; it forbids discharge for what has been found to be the real motive" of the Associated Press: the employee's Guild activity and his agitation for collective bargaining. *Id.* at 132, 57 S.Ct. at 655. Continuing, the Court stated: "The act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees." *Id.* Despite the attempt of the Associated Press to avoid inquiry into its decision, the Court permitted inquiry into, and required the Associated Press to disclose, the motive for taking adverse action against an employee engaged in union activities. If the asserted motives were merely pretextual and interfered with an

---

**17.** The Company also contends that there was insufficient evidence in the record to support the ALJ's finding (24a) that Stoddard's column had been cancelled because Stoddard "joined" the Union. Section 7, 29 U.S.C. § 157, gives employees, *inter alia,* the right to "join" *or* "assist" unions. Stoddard testified that he "was going to join the organizing committee," but did not testify that he joined the Union. Nevertheless, section 7 lists permissible activities on behalf of labor organizations in the disjunctive. Because substantial evidence supports the ALJ's alternative finding that the Company cancelled Stoddard's column for his role in assisting the Union, the Company's argument does not require an alternative disposition of the case.

**18.** The Company goes to great lengths to characterize the issue as one involving editorial discre-

tion. It repeatedly asserts that the "Board chose to litigate an issue dealing exclusively with the Company's decision not to print opinion columns written by Stoddard." Again, we disagree. Paragraphs 10 and 11, which are incorporated by reference in paragraphs 15 and 16 of the complaint (31a–32a), are considerably broader than the Company would have us believe. *See supra* note 6. We think the complaint, when fairly read, raises the issues of whether cancelling the column altered the terms and conditions of Stoddard's employment status and whether such action was discriminatory. In fact, only by ignoring paragraphs 15 and 16 of the complaint can one argue that the Board chose to challenge the Company's editorial discretion.

employee's protected activities, the employer was guilty of committing an unfair labor practice. The attempt of the Associated Press to prevent inspection of its motives by invoking the First Amendment was totally unsuccessful.

Similarly, in this case, the Company characterizes its decision as an editorial one and contends that the First Amendment prevents the Board from challenging its decision or inquiring into its motives. We disagree. Instead, we find the principles set forth in *Associated Press* directly applicable to this case.[19] Moreover, under the rule announced in *Wright Line*, the Company is not required to explain its decision unless and until the General Counsel has established a *prima facie* case that the employer has committed an unfair labor practice. Requiring the employer to respond at that time by demonstrating that it would have taken the adverse action even in the absence of protected conduct strikes a sensible balance that we are unwilling to disturb.[20]

Because the First Amendment does not prevent the General Counsel from either challenging the Company's decision or

questioning its motives and because the Company failed to offer a credible explanation for discontinuing Stoddard's column, we find that the Company failed to meet the burden imposed by *Wright Line* and *Transportation Management.* We, therefore, will affirm the Board's decision insofar as it finds that the Company violated sections 8(a)(1) and 8(a)(3) of the Act.

## VI.

■ Having determined that substantial evidence supports the finding that Stoddard's column was discontinued in violation of sections 8(a)(1) and 8(a)(3) of the Act and that the First Amendment does not preclude inquiry into the Company's motives for its decision, we turn to the Board's remedial order. In analyzing the order, we recognize initially that under section 10(c) of the Act, 29 U.S.C. § 160(c), the Board has considerable discretion in fashioning remedies for unfair labor practices. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969).

■ In its order, the Board attempted to "restore the *status quo ante* in the

---

**19.** Although *Associated Press* involved a discharge case, it is applicable to this case nevertheless. The ban on firing employees outright because of their union activities extends to other actions designed to adversely affect their employment conditions.

**20.** The Company primarily relies on two cases to support its contention that the Board may not inquire into the decision to discontinue Stoddard's column. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). Both cases are distinguishable. In *Catholic Bishop*, the only question the Court addressed was whether the Act conferred jurisdiction over teachers who taught both religious and secular subjects in church operated schools. 440 U.S. at 506–07, 99 S.Ct. at 1321–22. In concluding that Congress did not intend that the Act confer jurisdiction over these teachers, the Court distinguished *Associated Press*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. The Court never determined the Act was inconsistent with the First Amendment religion clauses.

The Company cites *Bill Johnson's* for the proposition that "where an action is constitutionally protected, the employer's improper motivation is irrelevant" (Appellant's Reply Brief at 3). In

*Bill Johnson's,* the Court held that the Board could not halt the prosecution of a state court civil suit brought by an employer to retaliate against employees for exercising federally protected labor rights without also finding that the suit lacks a reasonable basis in fact or law. *Bill Johnson's,* 461 U.S. at ——, 103 S.Ct. at 2169. Under the Court's holding, retaliatory or improper motive is far from irrelevant, it is essential. To prevail, therefore, the Board must be free to inquire into the employer's motives and must establish that they were retaliatory ones.

Finally, the Company assertion that "[i]t follows that if government may not dictate what words a newspaper can or cannot print, then it may not question the editorial decision-making process which precedes the printing" (Appellant's Brief at 24), is directly contrary to the Supreme Court's view. In *Herbert v. Lando*, 441 U.S. 153, 168, 99 S.Ct. 1635, 1644, 60 L.Ed.2d 115 (1979), the Court stated:

"[H]oldings that neither a State nor the Federal Government may dictate what must or must not be printed *neither expressly nor impliedly* suggest that the editorial process is immune from any inquiry whatsoever." (Emphasis supplied.)

instant dispute" (21a). To effectuate its objective, the Board attempted to regulate prospective publication decisions. The Board ordered, *inter alia,* that the Company "restore Mitchell Stoddard immediately to his former position as weekly columnist, and resume publication of Stoddard's weekly column, subject to the same lawful standards and requirements that Respondent [the Company], as an employer, imposes or may impose on its employees" (25a, 6a). In essence, this part of the Board's order has two unfortunate consequences. First, it seeks to compel the Company to publish what it prefers to withhold; and, second, it injects the Board into the editorial decision-making process on an ongoing basis. The Board contends that its remedy is "narrowly drawn to remove the consequences of the Company's unlawful discrimination and to restore the situation as it existed prior to the unfair labor practice" (Respondent's Brief at 43). The Board portrays its order as one requiring the Company to "treat Stoddard's submissions in a nondiscriminatory fashion" (Respondent's Brief at 43), and "to give normal consideration" to Stoddard's submissions (Respondent's Brief at 44). Despite the Board's attempt to characterize the order as one that merely requires the Company to give Stoddard's submissions "normal consideration" and treat them "in a nondiscriminatory fashion," the order is considerably broader. Indeed, the order unambiguously requires the Company to "resume publication of Stoddard's column."

The Supreme Court has implied consistently that newspapers have absolute discretion to determine the contents of their newspapers. In *Associated Press,* the Court recognized that under certain circumstances the Act might have to yield to First Amendment protections accorded the press. *Associated Press,* 301 U.S. at 132–33, 57 S.Ct. at 655–56. Application of the Act to the Associated Press did not abridge the freedom of the press because "the full freedom and liberty of Petitioner [the Associated Press] to publish the news as it desires it to be published" would not be circumscribed. *Id.* at 133, 57 S.Ct. at 656.

The Court implied that should the press's freedom and liberty "to publish the news as it desires it to be published" be circumscribed, the Act would have to yield to the First Amendment. Similarly, in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court held that the First Amendment does not relieve a newspaper reporter of the obligation to respond to a grand jury subpoena. The Court contrasted the case it was addressing with cases that might qualify for First Amendment protection. Among the latter group was the case involving an "express or implied command that the press publish what it prefers to withhold." *Id.* at 681, 92 S.Ct. at 2657. Similarly, in *Columbia Broadcasting v. Democratic Comm.,* 412 U.S. 94, 117, 93 S.Ct. 2080, 2094, 36 L.Ed.2d 772 (1973), the plurality opinion contrasted restrictions that could be imposed on a broadcast licensee with those that could be imposed on a private newspaper. Mr. Chief Justice Burger stated:

"The power of a privately owned newspaper to advance its own political, social, and economic views is bounded by only two factors: first, the acceptance of a sufficient number of readers—and hence advertisers to assure financial success; and, second, the journalistic integrity of its editors and publishers."

Until its decision in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1971), the Court's views on whether a newspaper could be compelled to publish that which it chose to withhold could be discovered only by implication. In *Tornillo,* however, the Court was explicit. The question presented to the Court was whether a Florida statute, which granted political candidates the right to reply to press criticism, violated the First Amendment because it required a newspaper that had criticized a candidate to publish the candidate's reply. Advocates of an enforceable right to access made strong arguments. After acknowledging the validity of the arguments favoring an enforceable right of access to the

press and the worthwhile purposes of the statute, a unanimous Court stated:

> "However much validity may be found in these arguments, at each point the implementation of a remedy such as an enforceable right to access necessarily calls for some mechanism, either governmental or consensual. If it is governmental coercion, this at once brings about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years."

*Id.* at 254, 94 S.Ct. at 2838 (footnotes omitted). In resolving the tension between the "right to access" statute and the First Amendment, the Court concluded:

> "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—*whether fair or unfair*—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."

*Id.* at 258, 94 S.Ct. at 2840 (emphasis supplied). Consequently, "the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." *Tornillo*, 418 U.S. at 259, 94 S.Ct. at 2840 (White, J., concurring).[21]

Applying these principles to the present case, we find that the Board's objectives may be valid ones; apparently the Board is attempting to ensure that the Company does not retaliate against Stoddard for his union activities with impunity and attempting to ensure meaningful remedies for victims of unlawful discrimination. Nevertheless, valid objectives are insufficient to permit the Board to require the Company to publish Stoddard's column. Implementation of a remedy that requires governmental coercion gives rise to a confrontation with the First Amendment. *Tornillo*, 418 U.S. at 254, 94 S.Ct. at 2837. To enforce the Board's order would require this court to recognize, for the first time, that government regulation of the material to go into a newspaper "can be exercised consistent with the First Amendment guarantees of a free press as they have evolved to this time." *Id.* at 258, 94 S.Ct. at 2840. We decline to do so.

A comparison of the degree of government involvement in *Tornillo* with that in this case also suggests our result. In *Tornillo*, the plaintiff sought to enforce a Florida statute that required newspapers to publish a one-time reply to that newspaper's attack on plaintiff's candidacy for political office. The Court, however, held that requiring the newspaper to publish a reply, even a one-time reply, could not be reconciled with the First Amendment. In contrast, the Board seeks to compel publication of Stoddard's column every week for the foreseeable future. Because the Supreme Court was unwilling to sanction even a one-time publication order, we are unwilling to sanction a publication order requiring the Company to publish Stoddard's column repeatedly. *See also Herbert v. Lando*, 441 U.S. at 166–68, 99 S.Ct. at 1644 ("In each of these cases [*Tornillo* and *Columbia Broadcasting*], we invalidated government efforts to pre-empt editorial decision by requiring the publication of specified material.").

The Board contends that because its order requires resumption of publication,

---

**21.** For a discussion of problems created by the First Amendment's prohibition against "abridging the freedom of speech or of the press" as interpreted by the Supreme Court of the United States, *see, e.g.,* L. Tribe, *American Constitutional Law* 697 (1978) ("power to compel speech comes too close to the power to censor speech: both must be forbidden"); Abrams, *In Defense of Tornillo*, 86 Yale L.J. 361, 365–69 (1976); Karast, *Equality As A Central Principle in the First Amendment,* 43 U.Chi.L.Rev. 20, 49–51 (1975). *See also* Note, *Reconciling Red Lion and Tornillo: A Consistent Theory of Media Regulation,* 28 Stan.L.Rev. 563 (1976); Note, *Reaffirming the Freedom of the Press: Another Look at Miami Herald Publishing Co. v. Tornillo,* 73 Mich.L.Rev. 186 (1974); Note, *The Supreme Court, 1973 Term—Political Candidate's Statutory Right of Reply to Newspaper Editorials,* 88 Harv.L.Rev. 174 (1974).

"subject to the same lawful standards and requirements that Respondent, as an employer, imposes or may impose on its employees," the remedial order is not constitutionally infirm. According to the Board, this clause renders its order consistent with *Tornillo* and *Associated Press v. United States*, 326 U.S. 1, 20 n. 18, 65 S.Ct. 1416, 1425 n. 18, 89 L.Ed. 2013 (1945). We disagree. Had the lead-in language mandating the publication of Stoddard's column been absent and had this clause been narrowly crafted, we would have been more sympathetic to the argument that the Board's order merely encompassed a nondiscrimination directive. An order that merely directed the Company to not discriminate against Stoddard on the basis of his union activity would present a much closer case. But this clause is written so broadly that it invites the Board to review the Company's publication standards and to become directly involved with the Company's exercise of editorial control and judgment. Moreover, when the clause is read in conjunction with the lead-in language, it is clear that the order involves "an express [and] implied command that the press publish what it prefers to withhold." *Branzburg*, 408 U.S. at 681, 92 S.Ct. at 2657. Thus we find that the clause does not save the otherwise constitutionally defective remedy. Instead, we find that the remedy mandating resumption of Stoddard's column must yield to the Company's First Amendment interest in retaining control over prospective editorial decisions. The Board does not have the power to disregard the First Amendment as interpreted in cases such as *Tornillo, Columbia Broadcasting, Branzburg,* and *Associated Press.*

Accordingly, we remand for further consideration to enable the Board to invoke any specific, alternate remedies consistent with part VI of this opinion to ensure that Stoddard is not retaliated against for his Union activities.