107 F.3d 922
 156 L.R.R.M. (BNA) 2544, 323 U.S.App.D.C. 289
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
HOLSUM BAKERS OF PUERTO RICO, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 96-1065.
United States Court of Appeals, District of Columbia Circuit.
 Jan. 10, 1997.
Rehearing Denied July 31, 1997.
 
 Before EDWARDS, Chief Judge, SILBERMAN, Circuit Judge, and BUCKLEY, Senior Circuit Judge.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record from the National Labor Relations Board and on the briefs and oral arguments of counsel. After full review of the case, the court is satisfied that appropriate disposition does not warrant an opinion. See D.C.Cir.R. 36(b). Accordingly, for the reasons stated in the accompanying memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED that the petition for review and cross-application for enforcement herein are granted in part and denied in part.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 41.
 
 MEMORANDUM
 
 4
 Holsum Bakers of Puerto Rico, Inc. petitions for review of the National Labor Relations Board's determination that it engaged in an unfair labor practice in violation of sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) and (a)(3), when, on October 14, 1993, it issued a final warning to its employee Carmelo Rivera-Rodiguez ("Rivera") and again when, on September 29, 1994, it discharged him. We grant Holsum's petition for review with respect to the October 14, 1993, final warning but deny the petition insofar as it relates to the September 29, 1994, discharge.
 
 
 5
 Rivera was employed by Holsum for twenty years as a general helper in its production department. During the summer of 1993, Rivera distributed and collected union authorization cards, encouraged employees to join the Congreso de Uniones Industriales de Puerto Rico ("the Union"), and appeared on five or six union-sponsored radio programs. On September 23, 1993, he participated as a union observer at a union representation election, which the Union lost. The events relevant to this petition for review occurred during the twelve months following the election.
 
 
 6
 Sections 8(a)(1) and (a)(3) of the Act provide, in relevant part, that "[i]t shall be an unfair labor practice for an employer" to interfere with an employee's collective bargaining rights under the Act, 29 U.S.C. § 158(a)(1), or to discriminate "in regard to hir[ing] or tenure of employment ... [in order] to encourage or discourage membership in any labor organization." Id. § 158(a)(3). To establish that an employer has committed an unfair labor practice in violation of these sections, the NLRB General Counsel must make a prima facie showing sufficient to support the inference that the employee's participation in protected conduct was a "motivating factor" in the employer's adverse action. Once the General Counsel makes that showing, the burden shifts to the employer to demonstrate that the action would have taken place even in the absence of the protected conduct. See Passaic Daily News v. NLRB, 736 F.2d 1543, 1552-53 (D.C.Cir.1984) (citing Wright Line, 251 N.L.R.B. 1083, 1089 (1980)). We will not disturb the Board's findings of fact when they are supported by substantial evidence based upon the record as a whole. Teamsters Local Union No. 171 v. NLRB, 863 F.2d 946, 952 (D.C.Cir.1988) (citations omitted).
 
 
 7
 Because, in this case, Holsum stipulated that it harbored an anti-union animus, Holsum Bakers of Puerto Rico, Inc., 320 N.L.R.B. 834, 834 (1996), we need only determine whether there was sufficient evidence in the record to support the Board's findings that in each instance, the reasons given by Holsum for its disciplinary actions against Rivera were pretextual.
 
 
 8
 I. OCTOBER 14, 1993, FINAL WARNING TO RIVERA
 
 
 9
 On October 6, 1993, approximately two weeks after the election, Rivera refused to accept his paycheck from one member of management. In the lunchroom the next day, he berated his foreman in an abusive manner for not giving him the check. Eight days later, and one day after a picture of Rivera and representatives of the Union appeared in a Puerto Rican newspaper of wide distribution, Holsum issued him a "final warning" for engaging in "improper, unacceptable and clearly provocative behavior aimed at disrupting institutional peace and order." Holsum/Seaboard Bakeries Personnel Action re: Carmelo Rivera Rodriguez, dated 10/14/93, reprinted in Appendix at 399. According to Holsum, during the week between the October 6, 1993, incident and the final warning, it followed its usual practice of conducting an investigation of the matter, which included interviewing witnesses, documenting the interviews, and having supervisors record their own recollections.
 
 
 10
 The Board concluded that the October 14, 1993, final warning was an unfair labor practice. It reasoned, inter alia, that Holsum's justification for the disciplinary action was pretextual because the warning was issued just one day after the picture of Rivera and the Union representatives appeared in the newspaper while the incident that allegedly gave rise to the action had occurred more than a week earlier. Holsum, 320 N.L.R.B. at 838. We find that the Board's inference of an anti-union motivation lacks substantial support in the record. Although the timing of the action could have established a prima facie case, Holsum overcame the adverse inference by adequately explaining the delay in the issuance of the final warning. Specifically, it was able to document a practice of investigation and verification of charges of employee misconduct that readily explained the eight-day interval between the offense and the issuance of the warning. Moreover, the disciplinary action in this case was proportional to the level of Rivera's misconduct and consistent with his prior disciplinary record. Two months earlier, on August 12, 1993, Rivera had received a final warning for using obscene language and defaming and denigrating the company's supervisors.
 
 
 11
 Finally, it strikes us as highly unlikely that the publication of the photograph would have caused Holsum to take disciplinary action against Rivera. At the time it was published, Holsum was thoroughly aware of Rivera's pro-union activities. The caption under the picture did not mention Holsum; it did not identify Rivera as an employee of Holsum or as a member of the Union; rather, it merely identified him as a "guest" at a party celebrating a settlement agreement with an unrelated company.
 
 II. SEPTEMBER 29, 1994, DISCHARGE
 
 12
 On September 29, 1994, Rivera was called to a meeting with three members of Holsum's management and read a final termination notice. The notice stated that he was being discharged because of his "defamatory, insulting and false remarks" about Holsum's products. This was a reference to statements Rivera had made to fellow employees to the effect that those products were "poisonous"; that he would not give them to his family; and that "not even pigs will eat them."
 
 
 13
 According to Holsum, it first learned of these statements in August 1994 when one of its employees, Teresa Perez, advised its vice president for manufacturing, Julio E. Vigoreaux, that Rivera had made derogatory comments about the bakery's products. The company insists that it had immediately launched an investigation into the matter, which included the taking of affidavits from employees who had heard Rivera make the remarks; and that with this confirmation in hand, it proceeded to discharge him. On the basis of evidence presented to an administrative law judge ("ALJ"), however, the Board concluded that Holsum's stated reason for discharging Rivera was pretextual and that Rivera had actually been terminated because he was contemplating a renewed attempt to unionize the company.
 
 
 14
 That conclusion was based on the following findings of fact: In December 1993 or January 1994, Holsum learned that Rivera had charged that its products were poisonous and were unfit for his family or even for pigs. Seven or eight months later, in August 1994, Perez reported to the company that Rivera had described its products as unfit for both his family and pigs, but did not state that he had described them as poisonous; at the same time, she advised management that Rivera was considering the possibility of another union campaign. The Board noted that it was only then that Holsum launched the investigation that led to Rivera's dismissal. It reasoned that because the company had failed to take any disciplinary action following the earlier report that Rivera had made the more serious charge that its products were poisonous, it was the possibility of renewed union action, not Rivera's disparaging comments, that led Holsum to discharge him. Holsum Bakers, 320 N.L.R.B. at 834-37.
 
 
 15
 Whether Holsum's stated reason for discharging Rivera was pretextual turns on one basic question of fact: When did Holsum first learn that Rivera had described its products as poisonous? Holsum insists that it did not learn of these remarks until August 1994. The Board, however, maintains that Holsum had been advised of them no later than December 1993 or January 1994.
 
 
 16
 The relevant testimony was given by three employees: Carlos Hernandez, Mayra Rivera-Cabeza, and Perez. Hernandez testified that after the election, Rivera had repeatedly stated that he would not give Holsum products to his family "because they had poison." Hearing Transcript ("Tr.") at 206. When asked on cross-examination if he remembered when the election was held, Hernandez said that he thought it was around June or July of 1994. Tr. at 210-11. The election, hwoever, actually took place on September 23, 1993. Hernandez further testified that he reported Rivera's comments to his supervisors "as soon as" he first heard them. Tr. at 211-12. On re-direct examination, Hernandez asserted that the conversations he had with Rivera occurred around November 1994 (i.e., over a year after the election) or "perhaps before." Tr. at 217-18. Hernandez then testified that the negative comments were made "[i]n '94 when the elections were held, during the elections." Tr. at 218. Because of this confused testimony, the ALJ requested a copy of Hernandez's affidavit. The affidavit, which was sworn to on November 30, 1994, states, in part:
 
 
 17
 [Rivera] would speak to me about a union he wanted to bring to the company. The union lost. I had to pass by him as part of my work and he would make negative remarks about the products. He would tell me that he did not buy the products, he would not give them to to [sic] his family, not even his grandchildren, because they had poison and they would poison them.... He made that remark to me approximately six times.... The first time he said that to me was between June and July of this year.
 
 
 18
 Affidavit of Carlos Manuel Hernandez, reprinted in Appendix at 439 (marginalia corrections included). The affidavit also states that Hernandez reported Rivera's statements to his immediate supervisor, Angel T. Santiago, and to Jose Sanchez of Quality Control. Id. at 440.
 
 
 19
 Rivera-Cabeza testified that she heard Rivera state that "that type of product could not even be given to pigs. And that anyone who were to eat that product could possibly [sic] him/herself." Tr. at 198. She claimed that Rivera began making these comments "after the elections were lost" in December 1993 to January 1994. Tr. at 200. Unlike Hernandez, Rivera-Cabeza did not report them to management.
 
 
 20
 Perez testified that on or about August 22, 1994, she told Vigoreaux that, during the prior month, Rivera had stated that he would not give Holsum products to his family, that they "were garbage, and that even the pigs did not eat them," Tr. at 222; and that Rivera was talking about the possibility of another union campaign. Tr. at 161. Perez did not testify that Rivera had described the food as poisonous.
 
 
 21
 Based on the testimony of these three witnesses, the Board determined that Holsum was aware of Rivera's "poison" comments as early as December 1993. Holsum Bakers, 320 N.L.R.B. at 837. Although the Board accepted Perez's testimony that Rivera made additional negative comments about the products in July 1994, it concluded that the investigation of those comments and the subsequent discharge occurred because of her report that Rivera was discussing the possibility of another union campaign. Id.
 
 
 22
 We find that there was sufficient evidence to support the Board's conclusion. Although Hernandez was confused as to dates, his testimony was consistent with regard to two essential points: Rivera had charged that Holsum's products contained poison shortly after the election, and Hernandez had reported them to management as soon as he had heard them. Moreover, Hernandez's testimony linking Rivera's outbursts with the election was corroborated by Rivera-Cabeza and not contradicted by Perez, who merely discussed additional, somewhat milder comments that Rivera had made at a later date.
 
 III. CONCLUSION
 
 23
 For the foregoing reasons, we find that there is sufficient evidence in the record to support the Board's conclusion that Rivera's discharge constituted an unfair labor practice; but we can find no such evidence to support the Board's determination that Rivera's October 14, 1993, final warning was an unfair labor practice. Accordingly, the petition for review is granted in part and denied in part.
 
 
 24
 So ordered.