# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 8, 2012      Decided December 18, 2012

No. 11-1284

AMPERSAND PUBLISHING, LLC, DOING BUSINESS AS SANTA
BARBARA NEWS-PRESS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

GRAPHICS COMMUNICATIONS CONFERENCE OF THE
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
INTERVENOR

———

Consolidated with 11-1348

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

———

*L. Michael Zinser* argued the cause for petitioner. With
him on the briefs were *Glenn E. Plosa*, *Carter G. Phillips*, and
*Paul J. Zidlicky*.

*Kira Dellinger Vol*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie Broido*, Supervisory Attorney.

*Ira L. Gottlieb* argued the cause and filed the brief for intervenor. With him on the brief was *James B. Coppess*.

Before: SENTELLE, *Chief Judge*, HENDERSON, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Petitioner Ampersand Publishing, LLC, publishes a daily newspaper, the Santa Barbara News-Press. In 2006 a long-smoldering dispute between Ampersand and newsroom staff, regarding control of the News-Press's content, burst into flames. We are asked to review the National Labor Relations Board's conclusion that Ampersand committed various unfair labor practices in the course of the fight. We hold that the National Labor Relations Act did not protect the bulk of the employees' activity and that the Board's misconception of the line between protected and unprotected activity tainted its analysis. Because we can conceive of no principle by which the Board could cleanse that taint, we grant the petition for review, vacate the Board's decision and order, and deny the cross-application for enforcement.

\* \* \*

Wendy McCaw, Ampersand's owner, purchased the News-Press in 2000. Between 2004 and the spring of 2006 there were a number of wrangles between her and the news

staff over what she perceived as bias in their reporting. She backed her claims with survey data indicating that readers saw the News-Press reporters as injecting their views into their reports, and with specific critiques of articles that in her view tended to slight the interests of wildlife (and the friends of wildlife) in interactions between wildlife and residents. *Ampersand Publishing, LLC*, 357 NLRB No. 51, at 14-15 (2011) (ALJ Op.). In 2006 McCaw and Arthur von Wiesenberger became the newspaper's co-publishers, and the clash intensified. As the Board put it, the dispute was over "a series of management decisions . . . that led employees to believe that the new publishers were inappropriately interfering with the work of the employees on the news-gathering side of the paper." *Id*. at 1 (Board Op.). In May 2006 reporters took umbrage when the publishers limited coverage of a News-Press editor's arrest and sentencing for driving while intoxicated. In June, the publishers reprimanded a reporter and three editors for printing the home address of a prominent actor living near Santa Barbara. *Id*. at 16-17 (ALJ Op.). The same day as the News-Press published the actor's address, management circulated a new policy banning "unauthorized disclosure, release, sharing or leaking of any proprietary, personnel or other information involving the New[s]-Press to [any] other news organization or media outlet." *Id*. at 18. More than a dozen employees resigned, calling the policy a "gag order."

On July 3, the two publishers left for vacation and the editor who had been arrested for alleged drunk driving became acting publisher. Two editors resigned July 5, and a raft of additional resignations ensued (at least nine on July 6, and one on each of July 7, 12 and 18), accompanied by a flurry of angry memos relating to control over content. *Id*. at 18-19. One employee, later fired, sought out the assistance of the Graphics Communications Conference of the International Brotherhood of Teamsters, and arranged a meeting in her

house on July 6. *Id*. at 19. On July 13, 2006, the employees served News-Press management with four demands, the first of which was aimed at limiting the publishers' "interference" with news content:

> 1. Restore journalism ethics to the Santa Barbara News-Press: implement and maintain a clear separation between the opinion/business side of the paper and the news-gathering side.
>
> 2. Invite back the six newsroom editors who recently resigned . . . .
>
> 3. Negotiate a contract with the newsroom employees governing our hours, wages, benefits and working conditions.
>
> 4. Recognize the [union] as our exclusive bargaining representative.

*Id*. at 2 (Board Op.).

Union-supporting employees held a series of rallies and demonstrations, most of which took place in a public square outside the News-Press headquarters. At the first rally, on July 14, 2006, approximately 20 employees protested the "gag order" by putting duct tape over their mouths. Employees held another rally four days later, whose theme, according to a staff-written article in the News-Press, was "restoring the wall between opinion and the news."

On July 20, 2006, the employees began a campaign for News-Press readers to threaten to cancel their subscriptions if Ampersand did not accede to the employees' demands. They distributed subscription cancellation pledge cards outside News-Press headquarters that day, as well as at public events in the following weeks. At rallies, they displayed a banner

reading "Cancel Your Newspaper Today." The cancellation drive rested overwhelmingly on the employees' quest for autonomy. For example, the printed pledge cards stated that the reason for the signers' threat to cancel was that they "support[ed] the Santa Barbara News-Press newsroom staff in its effort to *restore journalistic integrity* to the paper, obtain union recognition and negotiate a fair employment contract." Joint Appendix ("J.A.") 1601 (emphasis added).

Journalistic ethics and autonomy remained the theme in the ensuing weeks. At a public forum on July 26, 2006, staff writer Melinda Burns described her remarks as being "on behalf of a majority of newsroom employees who desperately want to be able to practice our profession in an atmosphere of . . . journalism ethics. . . . Above all, we hope to restore the News-Press as a place where openness and fairness in reporting—the foundations of a free press—will again flourish and thrive." *Id*. at 1602-03. After employees elected the union as their collective-bargaining representative on September 27, 2006, an employee told an interviewer, "We need a contract that guarantees that journalistic integrity is returned to this newsroom. . . . We need a contract that guarantees we're treated with the respect we deserve. And we need a contract that gives this community a newspaper it deserves." *Id*. at 1609.

On the morning of February 2, 2007, several employees hung two large banners on either side of a footbridge over Highway 101 in the Santa Barbara area, urging viewers: "Cancel Your Newspaper Today." Smaller, ancillary signs urged drivers to "Protect Free Speech." *Ampersand Publishing*, 357 NLRB No. 51, at 47, 50 (ALJ Op.).

In the course of the dispute, Ampersand discharged nine union-supporting employees—two allegedly for biased reporting, a third for refusing to fire one of the allegedly

biased reporters, and six for participating in the Highway 101 event. Petitioner cancelled another union supporter's column and gave four others lower annual evaluation scores than they had received in the past. After the union and a former newsroom supervisor filed complaints against Ampersand, the ALJ found—and the Board affirmed—that each of these actions violated § 8(a)(1) and/or § 8(a)(3) of the Act. The ALJ and Board further concluded that Ampersand violated § 8(a)(1) by coercively interrogating employees about union activity, surveilling union activity, and requiring employees to remove buttons and signs that said "McCaw Obey the Law."

In its decision, the Board asserted that the employees' concerted actions "were not in protest against a change in the [paper's] editorial stance," *id*. at 3 (Board Op.); it thus implicitly acknowledged the publishers' right to decide on such matters as political endorsements. Rather, it said, the management decisions that the workers protested "had and threatened to have a direct impact on the autonomy [that employees] had enjoyed in performing their work according to their perceptions of applicable professional norms as well as on their actual, day-to-day duties." *Id*. These "[r]estrictions on their autonomy and threats to their professional ethics directly implicated their interests as employees." *Id*. The Board also noted that besides the "journalistic ethics" issues, the employees were seeking recognition of the union "as their representative for purposes of bargaining over wages, hours, and other terms and conditions of employment generally." *Id*. at 3-4.

Between the ALJ's and the Board's decisions, the Board's Regional Director petitioned for an injunction requiring (among other things) that the News-Press reinstate the discharged employees. The district court for the Central District of California denied the petition. *McDermott v. Ampersand Publishing, LLC*, No. 08-1551, 2008 WL 8628728

(C.D. Cal. May 22, 2008). The Ninth Circuit affirmed. *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950 (9th Cir. 2010). Both courts rejected the Board's parsimonious view of the publisher's First Amendment rights. The district court observed: "The Union was organized, in part, to affect [Ampersand's] editorial discretion and undertook continual action to do so. It therefore does not seem possible to parse . . . [Ampersand's] animus toward the Union generally from its desire to protect its editorial discretion. The motives necessarily overlapped in this case." *McDermott*, 2008 WL 8628728, at *12, *quoted in McDermott*, 593 F.3d at 961. Accordingly, the district court denied the injunction on the ground that it would "significantly risk[] infringing the First Amendment rights of" the News-Press. *McDermott*, 2008 WL 8628728, at *5.

* * *

We review the Board's decision under the usual substantial evidence standard and the requirement that the Board's interpretation of the Act be "reasonable and consistent with applicable precedent." *Fashion Valley Mall v. NLRB*, 451 F.3d 241, 243 (D.C. Cir. 2006). We owe no deference to the Board's resolution of constitutional questions. See, e.g., *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1173-74 (D.C. Cir. 1980).

Section 7 of the Act gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The "mutual aid or protection" clause protects employee efforts to "improve terms and conditions of employment, or otherwise improve their lot as

employees." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). The courts' construction of § 7 leaves the Board broad authority, see, e.g., *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1251 (D.C. Cir. 2012), but there are limits. Concerted activity loses protection "if it fails in some manner to relate to 'legitimate employee concerns about employment-related matters.'" *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (quoting *Kysor/Cadillac*, 309 NLRB 237, 237 n.3 (1992)).

Newspapers, like other employers, are subject to the National Labor Relations Act. *Associated Press v. NLRB*, 301 U.S. 103, 132-33 (1937). Nonetheless, "otherwise valid laws may become invalidated in their application when they invade constitutional guarantees, including the First Amendment's guarantee of a free press." *Newspaper Guild of Greater Phila. v. NLRB*, 636 F.2d 550, 558 (D.C. Cir. 1990). Where enforcement of the Act would interfere with a newspaper publisher's "absolute discretion to determine the contents of [its] newspaper[]," the statute must yield. *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557-58 (D.C. Cir. 1984).

Given the publisher's First Amendment rights, issues of what is published and not published are not generally a "legitimate employee concern[]" for purposes of § 7's protection. The reporters and the Board are of course free to characterize these issues as ones of reporter "autonomy" and "journalism ethics" for their own purposes, but the power to so characterize them is not a power to conjure editorial control out of the publisher's hands.

The First Amendment affords a *publisher*—not a reporter—absolute authority to shape a newspaper's content:

The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of

the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press . . . .

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). We echoed this in *Passaic*: "The Supreme Court has implied consistently that newspapers have absolute discretion to determine the contents of their newspapers." 736 F.2d at 1557. And our holding in *Passaic* underscored the identity of the "newspaper" for these purposes. Though upholding the Board's finding of a violation in the paper's scrubbing a reporter's column in retaliation for his union activities (activities wholly unrelated to content or editorial judgment), *id*. at 1546-48, 1554-55, we set aside its order to publish the reporter's column every week for the foreseeable future, observing that the order would "invite[] the Board to . . . become directly involved with the Company's exercise of editorial control and judgment," *id*. at 1559.

The Board recognized the First Amendment problem in the present case, only to dismiss it out of hand. It said that its order "raise[d] no 'serious questions' under the First Amendment" because nothing in it "requires [Ampersand] to grant" the employees' demand that it "refrain from interfering with their autonomy in reporting the news." *Ampersand Publishing*, 357 NLRB No. 51, at 5. The Board addressed the hypothetical case of a classification of the employees' concerns as a mandatory subject of bargaining, under which circumstances the employees could, with government support, apply direct economic coercion to Ampersand in the form of a strike. Not to worry, said the Board. Assuming the employee demands were merely a permissive and not a mandatory subject of bargaining—which the Board did not decide—the

union would commit an unfair labor practice if it insisted to impasse on the demands; any resulting strike "may be unprotected by the Act." *Id.* at 7. This brush-off completely overlooks the order's clear coercive effect: it sanctions Ampersand for trying to discipline employees who sought to remain on its payroll and at the same time call on newspaper readers of Santa Barbara to cancel their subscriptions because Ampersand would not knuckle under to the employees' demands for editorial control. The First Amendment bars government pressure of this sort.

More conventional labor-law principles buttress the conclusion that a publisher's editorial policies do not constitute a "term or condition" of employment in which employees have a legitimate § 7 interest. "In general, 'employee efforts to affect the ultimate direction and managerial policies of the business are beyond the scope' of Section 7." *Riverbay Corp.*, 341 NLRB 255, 257 (2004) (quoting *Lutheran Soc. Serv. of Minn.*, 250 NLRB 35, 41 (1980)). The quality of the "product" is an aspect of these managerial prerogatives, so that social workers' demands relating to patient care constitute "[p]rotest against the quality of the product" and are "not encompassed by the 'mutual aid or protection' clause." *Lutheran Soc. Serv.*, 250 NLRB at 42; see also *Orchard Park Health Care Ctr., Inc.*, 341 NLRB 642, 645-46 (2004) (concurring opinion) ("Although employee interest in [an employer's] product is desirable, it is not thereby converted into a working condition. Factory workers . . . may manifest a strong interest in the goods they produce, but the nature of those goods is not a condition of employment . . . . ").

Here, newsroom employees' conduct was focused largely on protecting the quality of the relevant product, as they perceived it, from Ampersand's editorial policies. For example, union supporter Melinda Burns warned participants

in a public forum that "the once-proud institution of the News-Press . . . is in real danger. . . . The question before us is, Will the News-Press reflect the world as Wendy McCaw sees it, or will it reflect the lives and hopes and vision of the entire community?" (Burns's reference to the "hopes and vision of the entire community" did not include the logically necessary qualifier: "as perceived by the News-Press's reporters.") This appeal—well-intentioned as it may have been—went directly to the quality and managerial policies of the newspaper. And not only was the employees' goal unprotected, but in many aspects of their campaign they also used prohibited means—public disparagement of Ampersand's product. Such disparagements, then, were doubly unprotected. See *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1267 n.8 (D.C. Cir. 1997) (en banc) (citing *NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers* (*Jefferson Standard*), 346 U.S. 464, 477-78 (1953)).

The Board points out that employees who were disciplined in connection with editorial policies they were protesting had testified before the ALJ that the policies "undermined their integrity as journalists," causing them to lose credibility with sources and otherwise hampering their job performance. But to the extent that "journalistic integrity," as conceived by the Board and the reporters, requires a publisher's cession of some of its editorial control, the First Amendment precludes government coercion in its name. As the Court said in *Tornillo*, "A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." 418 U.S. at 256.

The Board also argues that, even if the employees' objective of gaining editorial control is unprotected, the Board's findings of unfair labor practices should stand because the campaign was not focused *solely* on increasing

employees' journalistic autonomy. Indeed, one of the demands the employees served on News-Press management was to "[n]egotiate a contract with the newsroom employees governing our hours, wages, benefits and working conditions." *Ampersand Publishing*, 357 NLRB No. 51, at 2. But the record on appeal makes clear that autonomy was the focus of the campaign. The record is replete with discussion of journalistic ethics and who rightfully controlled the content of the News-Press. Wages, benefits, and working conditions (apart from the reporters' concern for editorial control) drew scant reference. For example, when asked what newsroom employees sought to achieve through a collective bargaining agreement, reporter Dawn Hobbs (one of the named beneficiaries of the Board's order) testified that they thought it was "the only way that [they] could protect [them]selves" from "ethical breaches" "and protect [their] credibility and [their] integrity." When asked whether they sought any other "contractual procedures or provisions or benefits," she responded, "At that time, I think we were just really focused on that . . . ."

Of course employees' simultaneous pursuit of multiple goals—some protected by § 7 and some not—poses a conundrum. But whatever the ultimate answer, we do not think that employees can extend § 7's protections by wrapping an unprotected goal in a protected one, by tossing a wage claim in with their quest for editorial control. Judge Friendly addressed a comparable dilemma in endeavoring to apply the rule emerging from *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413 (1966), that government cannot proscribe a work "unless it is found to be *utterly* without redeeming social value." *Id*. at 419. Urged by the government in *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow,"* 404 F.2d 196 (2d Cir. 1968), to require at least a nexus between "the scenes of nudity and

sexual activity and the problems of the girl . . . in trying to work out her relationship with life," *id.* at 201, Judge Friendly responded:

> Although *Memoirs* did not in terms require such a nexus, I would agree that the presence of "redeeming social value" should not save the day if the sexual episodes were simply lugged in and bore no relationship whatever to the theme; a truly pornographic film would not be rescued by inclusion of a few verses from the Psalms.

*Id.* (Friendly, J., concurring). Here, of course, the First Amendment wholly favors protection of the employer's interest in editorial control, the *main* issue in dispute; it is hard to imagine that employees can prevail over that simply by adding "a few verses" of wage demands.

Finally, the Board argues that its decision should stand because there is no evidence that Ampersand's actions were motivated by a desire to protect its First Amendment rights, rather than by union animus. The Board concluded that Ampersand's explanations for its actions were pretextual—for example, Ampersand claimed that it discharged two union supporters because of their biased reporting—and that union animus thus must have been the true motivator. But here we return to the observation of the district court in the injunction proceeding, reiterated by the Ninth Circuit, namely, that this analysis "rests on a false dichotomy. The Union was organized, in part, to affect [Ampersand's] editorial discretion and undertook continual action to do so. It therefore does not seem possible to parse . . . [Ampersand's] animus toward the Union generally from its desire to protect its editorial discretion. The motives necessarily overlapped in this case." *McDermott*, 2008 WL 8628728, at *12, *quoted in McDermott*, 593 F.3d at 961.

Even if the Board properly found that Ampersand proffered pretextual reasons for its actions—a finding whose validity we do not decide here—the Board's analysis was tainted by its mistaken belief that employees had a statutorily protected right to engage in collective action aimed at limiting Ampersand's editorial control over the News-Press. The Board acted with full awareness of the analysis in the *McDermott* decisions, and evidently discerned no way to disentangle Ampersand's attitude toward the union "from its desire to protect its editorial discretion." We therefore vacate the Board's order and deny the cross-application for enforcement without addressing the parties' arguments regarding the details of the individual violations the Board found or the propriety of the remedy imposed.

\* \* \*

Ampersand's petition for review is granted, the Board's decision and order are vacated, and the Board's cross-application for enforcement is denied.

*So ordered*.